**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff,**

v.

**CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER, et al., Defendants.**

Civ. A. No. 86–2069.

United States District Court, District of Columbia.

June 3, 1987.

Laurence T. Scott, Brault, Graham, Scott & Brault, Washington, D.C., for defendant Children's Hosp.

James W. Greene, Deidre R. Horton, Washington, D.C., for defendant American Cas.

John Joseph Cassidy, James E. Rocap, III, Miller, Cassidy, Larroca and Lewin, Washington, D.C., for defendant Ong.

Richard McMillan, Jr., Crowell & Moring, Washington, D.C., for plaintiff St. Paul Fire & Marine Ins. Co.

## MEMORANDUM OPINION

### JOHN H. PRATT, District Judge.

This case arises from a dispute over insurance coverage for a $5.75 million judgment rendered in *Lee v. Children's Hospital National Medical Center, et al.* (*Lee*), Civ. Action 84–2456 (D.D.C. Apr. 28, 1986), on a claim of alleged medical malpractice.[1] St. Paul Fire and Marine Insurance Company (St. Paul) seeks a judgment declaring that neither of two excess liability policies issued by St. Paul to Children's Hospital National Medical Center (Children's Hospital) provides coverage for any portion of the *Lee* judgment. Children's Hospital and Dr. Beale Ong have raised the affirmative defenses of estoppel, waiver, laches and failure to join an indispensable party. In addition, Children's Hospital and Dr. Ong have counterclaimed for a declaration that St. Paul's excess liability policies provide coverage for the *Lee* judgment, and for damages based on alleged bad faith, bad faith failure to settle, and breach of contract.[2] Defendants Beale Ong and Children's Hospital in turn moved for summary judgment on the issue of coverage of the *Lee* judgment under St. Paul's excess policies. St. Paul has cross-moved for summary judgment on the complaint. Oppositions were filed to both the motion for summary judgment and the cross-motion. The matter has been fully briefed.

### Background

#### A. *The Insurance Policies at Issue*

Children's Hospital, during all the periods in question in this action, obtained both primary liability insurance and umbrella excess coverage from several sources. From December 31, 1965 until December 31, 1971, the primary liability insurance coverage was provided by St. Paul Policy No. 666NA9277 (St. Paul Primary Policy), which had applicable policy limits of $300,000. From August 1, 1967 to August 1, 1970, excess coverage was provided to Children's Hospital by American Casualty, pursuant to Policy No. RDU9001808 (American Excess Policy). The limits of the American Casualty excess policy were $1 million for each "occurrence" and $1 million in aggregate. From August 1, 1970 to August 1, 1971, St. Paul provided excess coverage pursuant to Policy No. 581XA2533 (St. Paul 1970 Excess Policy), which had applicable policy limits of $1 million per occurrence and $1 million in aggregate. From August 1, 1971 to December 31, 1971, St. Paul provided excess liability coverage pursuant to Policy No. 581XA5854 (St. Paul 1971 Excess Policy), with limits of $5 million per occurrence and $5 million in aggregate.[3]

---

1. The *Lee* case is presently on appeal to the United States Court of Appeals for the District of Columbia Circuit. *Children's Hospital v. Lee,* No. 86–5529 (D.C.Cir.).

2. While the basic dispute concerns St. Paul and Children's Hospital, there are two other insurance companies which have been joined in the various pleadings. Hartford Accident and Indemnity Co. and American Casualty Co. of Reading are also named as defendants to St. Paul's claims. In addition, defendants Children's Hospital and Beale Ong cross-claimed for declaratory relief against American Casualty and Hartford. Subsequently, the cross-claim against Hartford was dismissed without prejudice. Order of Oct. 17, 1986. Plaintiff and counterclaim defendant St. Paul has also cross-claimed against American Casualty and Hartford for any liability on the counterclaims.

3. The limits on St. Paul Policy No. 581XA5854 were originally $1 million/$1 million, but were raised to $5 million/$5 million by a rider effective September 1, 1971. There is dispute between the parties over whether the $5 million/$5 million limits apply to the whole policy period or only to the period from September 1, 1971 to December 31, 1971.

## B. *The Treatment of Alan Lee*

Alan Lee first came to Dr. Beale Ong, a pediatrician, on June 13, 1969.[4] Lee had previously been diagnosed as suffering from cerebral palsy. St. Paul's Stmt. of Mat. Facts to Which No Genuine Issue (St. Paul's Stmt.) at ¶ 2. During the June 13, 1969 visit, Dr. Ong took Lee's medical history and conducted a physical examination.[5] Resp. of Ong to Pltf. Req. for Adms. (Ong Resp.) at Resp. 2.[6] On the basis of this visit, Dr. Ong concluded that Lee suffered from cerebral palsy. Dr. Ong determined that he would like to see Lee again in one year. Ltr. of Ong to Robt. Schleinkofer, June 16, 1969.

Dr. Ong next examined Lee on April 6, 1970, at which time he found that Lee's spasticity had increased since the previous visit. Ong Resp. at Req. 8. On the basis of this examination, Dr. Ong referred Lee to Dr. Paul Griffin, who saw Lee on the same day. Dr. Griffin also concluded that Lee suffered from cerebral palsy, and recommended to Dr. Ong that Lee be hospitalized for more testing. Ong Resp. at Req. 13.

In June 1970, Dr. Ong recommended to Lee's parents that Lee be hospitalized for further testing because of "a small possibility that some other central nervous system problem may be associated." Ong Resp. at Reqs. 10, 15. Lee subsequently was hospitalized at Children's from July 27 to July 30, 1970. One of the principal purposes of this hospitalization was to determine whether Lee suffered from a cervical cord lesion. Tests and examinations were performed for this purpose. Ong Resp. at Req. 23. During the hospitalization and thereafter, Dr. Ong referred Lee to Dr. Gloria Eng for muscle evaluation and an ongoing program of physical therapy. Ong Resp. at Req. 29.

Dr. Ong's responsibility for Lee's treatment after July 31, 1970 is a matter of dispute between the parties. St. Paul contends that Dr. Eng became Lee's primary treating physician following the hospitalization. Dr. Ong and Children's Hospital contend that Dr. Ong continued to oversee Lee's treatment and that Dr. Ong conducted an additional physical evaluation of Lee on December 28, 1970.

In June, 1971, Dr. Eng wrote to Dr. Robert Haslam at the John F. Kennedy Institute in Baltimore, Maryland. Ong Resp. at Req. 30. Lee was admitted to the Kennedy Institute on October 12, 1971. Ong Resp. at Req. 32. During Lee's hospitalization at the Kennedy Institute, he was diagnosed for the first time as suffering from a cervical cord tumor. Ong Resp. at Req. 33. Dr. Ong and Children's Hospital admit that Lee was suffering from a cervical cord tumor at the time of Lee's initial visit to Dr. Ong in June 1969, and at all relevant times thereafter. Ong Resp. at Req. 35.

## C. *Lee v. Children's Hospital*

On August 9, 1984, Alan Lee filed his complaint in *Lee v. Children's Hospital, et al.*, Civ. No. 84–2456. Lee sued Children's Hospital, Dr. Ong, Dr. Eng and the members of Dr. Ong's partnership alleging that the failure to diagnose Lee's cervical cord tumor constituted medical malpractice. St. Paul Stmt. at ¶ 13. Children's Hospital and Dr. Ong notified St. Paul of the action and tendered the defense to St. Paul, as primary liability carrier. St. Paul, as primary carrier, accepted the defense of the *Lee* action without reservation and retained

---

**4.** Dr. Ong was an employee of Children's Hospital from 1968 until 1973–74. Ans. to Int. 6, Ans. of Beale Ong to Pltf's First Set of Ints., *Lee v. Children's Hospital*, Civ. No. 84–2456 (D.D.C. Oct. 25, 1984). Ong was also a member of a private practice partnership with Drs. William Howard and Gordon Daisley from 1963. *Id.* at Int. 1. Dr. John Chamberlain was a member of this partnership from 1966 to 1970. Defs. Daisley, Chamberlain and Howard's Ans. to Ints., *Lee,* at Int. 7 (D.D.C. Apr. 25, 1985).

**5.** The record is unclear as to whether Dr. Ong performed any other procedures or tests during this visit.

**6.** Children's Hospital has adopted, for the purposes of this action, all of Dr. Ong's responses to St. Paul's First Request for Admissions, except for Dr. Ong's responses to Reqs. 42, 43. Resp. of Children's Hosp. to Pltf's First Set of Reqs. for Adms. and Ints.

counsel to represent Children's Hospital and Dr. Ong. St. Paul Stmt. at ¶ 15.

As the *Lee* litigation wended its way through a tortured course of discovery and pre-trial proceedings, Lee demanded, on March 21, 1985, $7 million to settle the claims against all defendants. Counterclaim at ¶ 17(h). On April 9, 1985, Dr. Ong, by letter, demanded that St. Paul settle within the limits of the primary and the two St. Paul excess policies. Counterclaim at ¶ 17(k). Lee renewed the $7 million settlement demand on January 2, 1986. *Id.* On February 7, 1986, Children's Hospital also demanded that St. Paul settle within the limits of the primary and the excess policies. *Id.* The *Lee* trial began on February 12, 1986.

Two days later, on February 14, 1986, St. Paul sent Children's Hospital a letter requesting the basis for Children's assertion that the 1971 Excess Policy provided coverage for Lee's claim. Counterclaim at ¶ 17(m). Children's Hospital responded by letter on February 24, 1986. *Id.* On March 20, 1986, St. Paul formally notified Children's Hospital, by letter, of possible noncoverage under both the 1970 and the 1971 Excess Policies. *Id.* at ¶ 17(n). Trial was continuing in *Lee.*

On April 28, 1986, the jury returned a verdict against Dr. Ong, finding Ong liable for malpractice and awarding Lee $5.75 million in compensatory damages. The jury found that Dr. Eng was not liable. On the basis of this verdict, Judge Penn directed a verdict against Children's Hospital and against Dr. Ong's partners, Drs. Daisley and Howard. Order of May 1, 1986, *Lee v. Children's Hospital.*[7] A week later, on May 8, 1986, St. Paul notified Children's Hospital that neither the 1970 nor the 1971 Excess Policy provided coverage for any portion of the *Lee* judgment. Counterclaim

at ¶ 20. On July 2, 1986, Judge Penn denied the defendants' motion for a judgment notwithstanding the verdict.

### Discussion

The issues presented by the cross-motions for summary judgment fall into two broad groups. First, we must determine whether coverage for the *Lee* judgment has been "triggered" under the St. Paul 1970 and 1971 Excess Policies.[8] Second, if we find that the St. Paul excess policies do not, by their terms, provide coverage for the *Lee* judgment, we must decide whether St. Paul is estopped from denying coverage because of its conduct of the *Lee* defense. Both parties agree that the law of the District of Columbia governs this diversity action.

### I. *Coverage Under St. Paul's Excess Policies*

Both of the St. Paul excess policies present identical issues of insurance policy interpretation. At the core of the dispute here is the question of what event triggers coverage under these policies. In its motion for summary judgment, Children's Hospital and Dr. Ong assert that coverage under the St. Paul Primary Liability Policy triggers coverage under the excess policies. St. Paul, on the other hand, contends that the excess policies are only triggered if the first injury resulting from malpractice occurs during the period that the particular excess policy was in effect. In the main, we agree with the interpretation of the trigger of coverage proffered by St. Paul.

The St. Paul 1970 Excess Policy and the St. Paul 1971 Excess Policy are virtually identical, except for the effective dates, policy numbers and limits of liability. The

---

**7.** The parties had agreed that a verdict against Dr. Ong or Dr. Eng would also be a verdict against Children's Hospital. *Lee,* Trial Trans. at 6792. Since the jury was not presented with the factual question of whether Children's Hospital itself acted negligently toward Lee, independent of Ong's negligent treatment, we conclude that the sole basis for judgment against Children's Hospital was Children's Hospital's vicarious lia-

bility, under *respondeat superior,* for any torts by Dr. Ong.

**8.** As used in this opinion, "coverage" refers to the duty to indemnify. "Coverage" is "triggered" when all conditions precedent to the duty to indemnify have been satisfied. The interpretation of unambiguous terms in an insurance contract is a matter of law.

coverage clauses are worded identically.[9] In addition, both excess policies contain the same endorsement governing professional claims, which states:

> Except insofar as coverage is provided by an underlying policy or policies as listed in Schedule A, it is agreed that this policy does not apply to Personal Injury claims arising out of any error or omission, malpractice or mistake of a professional nature committed or alleged to have been committed by or on behalf of the Insured in the conduct of any of the Insured business activities.[10]

It is the "except insofar" clause that lies at the heart of the dispute over coverage under the St. Paul excess policies.

■ Defendants Ong and Children's Hospital argue that when coverage is provided pursuant to an "except insofar" clause, the only legal issue is whether coverage is afforded under the underlying policies. Since St. Paul has admitted liability under the underlying primary policy, defendants Ong and Children's assert that St. Paul must be liable for coverage under the excess policies as a matter of law. The flaw in this interpretation is, however, readily apparent. Were we to accept defendants' construction of the "except insofar" clause, the 1970 and the 1971 excess policies would both provide coverage for any claim arising during the term of the primary policy, since coverage would be "available" under the primary policy. This construction would also render the effective dates of the excess policies meaningless and of no effect. Defendants' interpretation of the "except insofar" clause,

upon which defendants have placed principal reliance, assaults common sense.

Discerning the proper interpretation of the "except insofar" endorsement requires further analysis and presents a somewhat more difficult problem. The excess policies provide indemnity for loss on account of "Personal Injuries ... to which this Policy applies, caused by an occurrence." St. Paul 1970 Excess Policy ¶ I; St. Paul 1971 Excess Policy ¶ I (coverage clause). The policies "appl[y] to personal injury ... which occurs anywhere during the policy period." St. Paul 1970 Excess Policy ¶ IV; St. Paul 1971 Excess Policy ¶ IV (applicability clause). The "except insofar" endorsement, by its plain terms, operates as a further restriction upon the scope of "Personal Injuries ... to which this Policy applies." Under the "except insofar" endorsement, the excess policies only "apply" to losses stemming from malpractice claims that were also covered by the underlying St. Paul Primary Liability Policy. Reading the coverage clause, the applicability clause and the "except insofar" endorsement together, three conditions must be satisfied in order for a malpractice claim to give rise to St. Paul's duty to indemnify, *i.e.* to "trigger coverage:" (1) the malpractice claim must be covered under the underlying St. Paul Primary Policy; (2) the injury must have occurred during the period that the particular excess policy was in effect; (3) the injury must have been caused by an "occurrence."

■ There can be no doubt that Lee's malpractice is covered by the underlying St. Paul Primary Liability Policy, or that there has been an injury caused by an "occurrence."[11] The only "trigger of cov-

9. The coverage clause in both St. Paul excess policies reads:

> The company will indemnify the Insured for all sums which the Insured shall be legally obligated to pay as damages, all as more fully defined by the term "ultimate net loss" on account of:
> 1. Personal Injuries,
> 2. Property Damage,
> 3. Advertising Offense,
> to which this Policy applies, caused by an occurrence.

St. Paul 1970 Excess Policy ¶ I, St. Paul 1971 Excess Policy ¶ I.

10. The St. Paul Primary Liability Policy is listed on Schedule A.

11. The excess policies, unlike the underlying St. Paul primary liability policy, retain the standard definition of "occurrence." *Compare* Excess Policies at p. 5 ¶ 8 (defining "occurrence") *with* St. Paul Primary Liability Policy at p. 7B ¶ 4 (deleting the definition of "occurrence" with respect to the Comprehensive Hospital Liability coverage). We conclude, however, that the "except insofar" endorsement implicitly alters the definition of occurrence in the excess policies to include forms of medical malpractice, such as the "failure to treat," which may not fall within

erage" issues are when the injury "occurred" and whether "injury" occurred during the policy periods of the excess policies. Notably, it is the injury that must occur during the policy period, not the "occurrence." The "occurrence," *i.e.* negligent act or omission, may occur at any time so long as the resulting injury occurs while the applicable policy is in effect.[12] All of the St. Paul excess and primary policies at issue here, therefore, have "injury" triggers.

This brings us to the question of when does "injury" occur, under the terms of the applicability clause of the excess policies. Specifically, defendants argue that "injury occurs" under the applicability clause whenever any manifestation of the malpractice occurs during the policy period. In this case, defendants argue that Lee's progressive deterioration, which occurred well into the periods of both St. Paul excess policies, constitutes injury occurring during the policy periods of the St. Paul excess policies. Plaintiff, on the other hand, argues that "injury occurs" at the time the first injury is suffered, and that further deterioration is not a separate occurrence triggering coverage under future policies.

■ Putting aside, for the moment, the question of aggravating acts of negligence, the two principal occasions of misdiagnosis of Lee's condition occurred prior to the effective date of either St. Paul excess policy. Considering only the 1969 office examination and the July 1970 hospital examination of Alan Lee, we cannot agree with defendants that St. Paul's liability under either excess policy is triggered by Lee's further deterioration as a result of these two negligent acts. Were we to follow the position articulated by defendants, we would be forced to conclude that a single misdiagnosis triggers every "injury trigger" insurance policy from the date of the misdiagnosis until the pathology is arrested by subsequent medical treatment or death. Such a conclusion would ignore the distinctive nature of the claimant's injury in a misdiagnosis or "failure-to-diagnose" malpractice case.

■ A misdiagnosis or "failure-to-diagnose" malpractice case is distinctive because the claimant was already suffering the disease at the time he sought treatment. Such was the case of Alan Lee. Had the Lees not sought treatment, Alan faced the advance of his disease, with its probability of a progressive deterioration. The court in *Lee* found that because of Dr. Ong's negligence in diagnosis, Lee faced the same advance of disease that he would have faced had he not sought medical treatment. The "injury" resulting from Dr. Ong's alleged malpractice is the continued presence of the disease and the exposure to its deleterious effects. This injury occurs at the moment the doctor failed to detect the disease.

Our holding that "injury occurs" in a failure to diagnose case at the time of misdiagnosis does not run contrary to the case law. None of the cases cited by plaintiff or defendants holds that an "injury" trigger policy provides coverage, in the absence of aggravating acts, solely on the basis of continued deterioration. Even in the D.C. Circuit's asbestos decisions, we find no suggestion that deterioration after the first manifestation of injury triggers

---

the standard "occurrence" definition. *See* Memo. of P & A's in support of Def. Mot for S.J. at 9 n. 10. Any other reading of the policies would be contrary to common sense.

**12.** We note at this point that the "triggers of coverage" for the excess policies and the "trigger of coverage" for the primary policy both turn on the same event, the occurrence of injury during the effective period of the respective policy. As a result, the presence of a definition of "occurrence" in the excess policies and the absence of a similar definition in the primary policy have no bearing upon the question of whether the

requisite injury occurred at the time the respective policies were in effect. Even if we adopted the position taken by Ong and Children's Hospital in their Opposition to Plaintiff's Cross-Motion for Summary Judgment, *i.e.,* that coverage under an excess policy is triggered whenever an injury that would trigger primary policy liability occurs during the policy period of the excess policy, our conclusions with respect to coverage under the excess policies would still be the same. We would still need to determine what constitutes "injury" and when such an "injury" occurred.

later policies. *See Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981); *Abex v. Maryland Casualty Co.,* 790 F.2d 119 (D.C.Cir.1986).[13] As this court recently stated in a case under Missouri law, "[t]he injury is a distinct event rather than a continuous process extending over a prolonged period of time." *Independent Petrochemical Corp. v. Aetna Casualty and Surety Co.,* 672 F.Supp. 1 (D.D.C. 1986). We agree.

■ This brings us to the question of negligent conduct aggravating existing injuries or causing additional injuries. Defendants argue that each successive impairment suffered by Lee constitutes an "additional injury" that could have been prevented if the misdiagnosis had been corrected. This argument is, however, nothing more than a restatement of defendants' position that "injury occurs" under the applicability clause whenever any deterioration occurs during the policy period. We reject defendants' arguments on "additional injury" for the same reasons we reject their argument that "injury occurs" whenever any deterioration occurs.

As laid out by this court in the *Independent Petrochemical* decision, although a single culpable act gives rise to an injury at a distinct time, additional culpable acts may form the basis for liability under a policy if the additional act causes additional injuries or aggravates existing injuries during the policy period. *Id.* In this case, since we hold that injury occurs at the time of misdiagnosis, the question must be whether Dr. Ong engaged in subsequent negligent behavior that caused Lee to continue to be exposed to the progress of his disease, thus aggravating the injury by failing to curtail the effects of the misdiagnosis. In a case such as this, the issue must be whether the conduct subsequent to the initial diagnosis was sufficient to constitute an additional cause of claimant's injury. *See Glacier General Assurance v. Continental Casualty Co.,* 605 F.Supp. 126, 129 n. 4 (D.D.C. 1985). The test is the same as for "concurrent cause" cases: the subsequent conduct must have been a "substantial factor" in bringing about the ultimate result. *Id.*

■ In order for subsequent conduct, in this case alleged subsequent treatment, to constitute a "substantial factor" in the result, there must be some evidence that the doctor did more than simply carry out a course of treatment predicated on the earlier misdiagnosis. Absent some independent evaluation of the prior diagnosis and treatment or some subsequent symptoms which should have led the doctor to reevaluate his earlier diagnosis, the succeeding course of treatment cannot be a "substantial factor" in the continuation of the misdiagnosis. *See Aetna Casualty v. Medical Protective Co. of Ft. Wayne,* 575 F.Supp. 901, 903 (N.D.Ill.1983). Subsequent acts implementing a prior negligent decision, without more, will not trigger additional insurance coverage.

On the basis of the extensive factual record in this case and in the *Lee* case, we cannot find facts sufficient to permit a reasonable jury to conclude that Dr. Ong reevaluated his prior diagnosis and treatment at any time during the policy period of the 1971 St. Paul Excess Policy (Aug. 1, 1971 to Dec. 31, 1971). As far as we can discern, the last time Dr. Ong examined Alan Lee was in December, 1970. *Lee,* Trial Trans. at 3651. The documentary record shows that when Dr. Eng recommended to Dr. Ong that Alan Lee be sent to the Kennedy Institute for an "intense psycho-social and physical rehabilitation program." Ltr. of Gloria Eng to Beale Ong dated June 21, 1971, Ex. G. to Ong Resp.[14] Dr. Eng's letter does not suggest

---

**13.** These asbestos cases are not controlling since the issue before the D.C. Circuit was very different from the issue here. In those cases, the Court of Appeals faced the question of whether injury was suffered at the time of exposure, the time of the onset of disease, the time of manifestation or diagnosability of the disease, or some combination. In this case, onset and manifestation of the disease preceded the negligent act, and in fact provided part of the basis upon which Dr. Ong should have diagnosed Lee's disease.

**14.** *See also Lee,* Trial Trans. at 3661–2 (Testimony of Beale Ong).

that Lee was sent to the Kennedy Institute as part of a diagnostic reevaluation. Moreover, Dr. Eng sent her last report on Alan Lee to Dr. Ong on June 21, 1971. Thus, even if there was something in Dr. Eng's June 21, 1971 report that should have caused Dr. Ong to reevaluate his diagnosis, any failure to diagnose based on that report would have occurred prior to the August 1, 1971 effective date of the 1971 St. Paul Excess Policy. On this record, summary judgment for plaintiff St. Paul on the issue of liability under the terms of the 1971 Excess Policy is appropriate.

There is also little or no evidence in the record to show that Dr. Ong engaged in a diagnostic reevaluation between August 1, 1970 and August 1, 1971.[15] Specifically, Dr. Ong alleges that he examined Alan Lee in December, 1970. As Dr. Ong testified in the *Lee* trial, however, he made no notation in Lee's medical chart for that visit. *Lee*, Trial Trans. at 3648. When asked during the *Lee* trial whether he had ruled out a spinal cord lesion and concurred in a diagnosis of cerebral palsy, Dr. Ong stated, "I would say that, in my mind, at the time of discharge, we had ruled out the presence of a spinal cord tumor. I thought Alan Lee had the diagnosis of cerebral palsy when he left the hospital in 1970." *Lee* Trial Trans. at 3916. Furthermore, Dr. Ong, after listing the various types of evidence supporting his diagnosis, testified, "... we felt there was absolute in our minds that this [cerebral palsy] was the diagnosis we were dealing with, and so on that basis we went ahead and prescribed further treatment along those lines." *Id.* At no time during his trial testimony did Dr. Ong indicate that he questioned his diagnosis after Lee was discharged from Children's on July 31, 1970. With no evidence in the record of this case or the *Lee* case to show that Dr. Ong ever did more than execute treatment based on his pre-August 1, 1970

diagnosis, it appears that Dr. Ong did not reevaluate his diagnosis and course of treatment on or after August 1, 1970.

█ It may be, however, that there was symptomology that came to Dr. Ong's attention during the period August 1, 1970 to August 1, 1971 that made it negligent for him not to question his diagnosis of cerebral palsy. The evidence in the *Lee* trial on this point is somewhat equivocal. Dr. Ong received two reports from Dr. Eng, dated December 28, 1970 and June 21, 1971 respectively, and also allegedly examined Alan Lee during the December, 1970 visit. Dr. Ong testified that the symptoms described by Dr. Eng in her December 1970 and June 1971 reports were consistent with a diagnosis of cerebral palsy or spinal tumor, as well as other conditions. *Lee*, Trial Trans. at 3651, 3655. Because these reports took place within the period of coverage of the 1970 Excess Policy, this leaves a narrow, unresolved issue of material fact, *i.e.*, whether Dr. Eng's reports of December, 1970 and June, 1971 should have put Dr. Ong on notice that his earlier diagnosis was erroneous. Construing this fact in favor of defendants Ong and Children's Hospital, as we are compelled to do, we deny St. Paul's cross-motion for summary judgment on the 1970 Excess Policy.[16]

In sum, for the reasons stated above, defendants' motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted in part and denied in part on the issue of coverage under the terms of the excess policies. On the 1970 St. Paul Excess Policy, an unresolved issue of material fact precludes summary judgment for St. Paul on the issue of coverage under the terms of the policy. On the 1971 St. Paul Excess Policy, summary judgment for St. Paul on the issue of coverage under the terms of the policy is appropriate and

---

**15.** In the plaintiff's Statement of Material Facts, plaintiff states:
> The jury's award in the *Lee* action was predicated on Alan Lee's claims of injuries and aggravation of those injuries between June, 1969 and June, 1971 and thereafter.

Plaintiff's Statement of Facts at ¶ 18. Defendants make much of this statement. In the light

of the evidence, however, we will construe plaintiff to be using "aggravation" to mean "progressive deterioration," without imparting to it a legal conclusion.

**16.** Should this fact become undisputed, St. Paul can, of course, renew this motion for summary judgment.

shall be granted. Thus, we must examine defendants' affirmative defense of estoppel.

## II. *The Estoppel Defense*

Defendants Ong and Children's Hospital assert that even if coverage for the *Lee* judgment is unavailable under the terms of the excess policies, St. Paul should be estopped from denying coverage because it assumed and conducted the defense of Lee's claims on behalf of Children's Hospital and Dr. Ong without expressly reserving its right to disclaim excess coverage. Defendants ask that, pursuant to Fed.R. Civ.P. 56(f), we postpone adjudication of the estoppel issues pending discovery. Because the estoppel claim can be resolved on the facts submitted and arguments already briefed, we decline to stay adjudication of this issue.

■ It is not in dispute that St. Paul, as the primary liability carrier, accepted the defense of the Lee claims without reservation. It is also not disputed that St. Paul did not indicate to Children's Hospital and Dr. Ong that the excess policies might not provide coverage for a judgment in the *Lee* case until trial was partially completed, and that St. Paul did not formally disclaim coverage under the excess policies until after the *Lee* verdict had been rendered. The issue here, however, is whether St. Paul had a duty to disclaim coverage or reserve rights under the excess policies at the time it assumed the defense of the Lee claims under the primary policy, or at some other time prior to judgment. We conclude that, prior to the time the verdict was rendered, St. Paul had no such duty to speak with respect to the excess policies.

■ The duty to disclaim coverage or to reserve rights is a part of the duty to defend. If a carrier has the duty to defend the insured, the carrier will be estopped from denying coverage in a later proceeding if the carrier has conducted the defense of the insured with knowledge of any defense to liability. *Walker v. American Ice Co.*, 254 F.Supp. 736 (D.D.C.1966). This means that when the insured tenders the defense of the claim to the carrier, the carrier must either accept the defense and admit coverage, disclaim coverage, or conduct the defense subject to a reservation of rights. Notably, it is the duty to defend that gives rise to the duty to disclaim coverage or reserve rights at the time the defense is accepted.

St. Paul, in its capacity as the excess carrier, had no duty to defend Ong and Children's Hospital. The duty to defend arose solely under the primary liability policy.[17] Thus, when Children's Hospital and Dr. Ong tendered the defense of the Lee claims to St. Paul as primary liability insurer, St. Paul had a duty to disclaim coverage or reserve rights with respect to the primary liability policy. It had no obligation to speak with respect to the other policies.[18] Since there was no obligation to speak, that can be no implicit promise of coverage upon which to base estoppel. Thus, defendants' affirmative defense of estoppel will not bar summary judgment for St. Paul on the issue of liability under the 1971 policy.[19]

---

17. Although the duty to defend can occasionally fall to the excess carrier, this would only happen if the limits of the primary policy were exhausted by judgment or settlement and the insured called upon the excess carrier to provide the defense. In this case, the limits of the primary policy were not exhausted and Children's Hospital and Dr. Ong did not call upon the excess carriers to provide a defense. 7C Appelbaum, Insurance Law and Practice (Berdal ed.), § 4682. Thus, the excess carriers had no duty to defend.

18. In *Whiting Corp. v. Home Insurance Co.*, 516 F.Supp. 643, 646 (S.D.N.Y.1981), the court, while noting that it was presented with the issue of the excess carrier's "obligation to speak,"

failed to address this question, concentrating wholly on the issue of prejudice. Because the existence of a duty to speak is a question of law that must be addressed prior to any factual inquiry, the *Whiting* court held *sub silentio* that the excess carrier had a duty to speak. For the reasons set forth, we respectfully disagree.

19. We will also grant summary judgment in favor of St. Paul on the issue of estoppel with respect to the 1970 excess policy. In addition, since defendants have failed to raise the defenses of waiver and failure to join an indispensible party in their opposition to St. Paul's cross-motion for summary judgment, these defenses are waived with respect to the 1971 excess policy.

 

## Conclusion

Accordingly, we conclude that St. Paul is not liable for the *Lee* judgment under the terms of the 1971 St. Paul Excess Policy, Policy No. 581XA5854, and that St. Paul cannot be estopped from denying coverage under this policy. As such, St. Paul is entitled to summary judgment with respect to its liability under the 1971 excess policy. As to the 1970 St. Paul Excess Policy, Policy No. 581XA2533, an unresolved issue of material fact precludes summary judgment for St. Paul at this time.

An order consistent with the foregoing has been entered this day.

## ORDER

The court has before it the motion of defendants Beale Ong and Children's Hospital National Medical Center for summary judgment, and plaintiff St. Paul's cross-motion for summary judgment. Both motions have been fully briefed. For the reasons set forth in the accompanying memorandum opinion, it is by the court this 3rd day of June, 1987,

ORDERED that the motion of defendants Beale Ong and Children's Hospital National Medical Center for summary judgment is denied, and it is

ORDERED that the cross-motion of St. Paul for summary judgment is granted in part and denied in part, and it is

ORDERED that as to St. Paul Umbrella Excess Liability Policy No. 581XA5854 (the 1971 Excess Policy) summary judgment is granted in favor of plaintiff St. Paul and it is

ORDERED that plaintiff St. Paul has no liability under Umbrella Excess Policy No. 581XA5854 to provide excess insurance coverage to defendants, or any of them, for any of the damages claimed and/or awarded in favor of Alan Lee in the action of *Lee v. Children's Hospital National Medical Center, et al.*, Civ. No. 84–2456 in this court, and it is

ORDERED that as to St. Paul's Umbrella Excess Liability Policies No. 581XA2533 and No. 581XA5854 summary judgment is granted in favor of plaintiff St. Paul on the issue of defendant's affirmative defense of estoppel, and it is

ORDERED that all other portions of St. Paul's cross-motion for summary judgment are denied, and it is

ORDERED that the motion of Children's Hospital and Dr. Ong for a status call is granted, and it is

FURTHER ORDERED that a status call be held on June 25, 1987 at 9:30 a.m., Courtroom No. 12, United States Courthouse.