**UNITED STATES FIRE INSURANCE COMPANY, Plaintiff,**

v.

**VANDERBILT UNIVERSITY, Vanderbilt University Medical Center, St. Paul Fire & Marine Insurance Company, St. Paul Mercury Insurance Company, Defendants.**

No. 3:99–0048.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 27, 2000.

See also 18 F.Supp.2d 786.

H. Buckley Cole, Greenebaum, Doll & McDonald PLLC, Nashville, TN, Brian S. Martin, Robert A. Shults, Janis H. Detloff, Sheinfeld, Maley & Kay, P.C., Houston, TX, for U.S. Fire Ins. Co.

H. Lee Barfield, II, William N. Ozier, Joseph F. Welborn, III, Bass, Berry & Sims, Nashville, TN, Gino J. Benedetti, Gregg W. Mackuse, Miller, Alfano & Raspanti, P.C., Philadelphia, PA, George Bow McGugin, Watkins, McGugin, McNeilly & Rowan, Nashville, Bethany K. Culp, Elliott M. Flies, Oppenheimer, Wolff & Donnelly LLP, St. Paul, MN, for Vanderbilt University, Vanderbilt University Medical Center, St. Paul Fire & Marine Ins. Co., St. Paul Mercury Ins. Co.

### MEMORANDUM

TRAUGER, District Judge.

The following motions are before the court: (1) St. Paul's Motion to Dismiss Complaint and/or for Summary Judgment (Docket No. 20); (2) Vanderbilt's Motion to Dismiss and/or for Summary Judgment

(Docket No. 59); (3) U.S. Fire's and Vanderbilt's Cross–Motions for Summary Judgment on the Issue of Notice (Docket Nos. 50, 80); (4) U.S. Fire's Motion for Summary Judgment on the Issue of Exhaustion (Docket No. 97); (5) U.S. Fire's Motion for Review of Magistrate Judge Griffin's June 14, 1999 Order (Docket No. 36); and (6) U.S. Fire's Motion for Leave to Amend its Complaint (Docket No. 119). Oral argument was held on October 12, 1999.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 1994, a class action suit was filed against numerous defendants, including Vanderbilt University, Vanderbilt University Medical Center and the Rockefeller Foundation by certain class representatives, *Craft v. Vanderbilt University*, 3:94–0090 (Judge Nixon). In that action, the plaintiffs alleged that the Vanderbilt defendants had conducted the "Tennessee Vanderbilt Nutrition Project" ("TVNP") in which approximately 829 pregnant women were given a liquid containing radioactive iron between September 1945 and May 30, 1947 without their knowledge or consent. (Docket No. 12, Ex. C at 1) The plaintiffs further alleged that the Vanderbilt defendants had conducted a follow-up study from 1964 to 1969 during which the participants in the TVNP were interviewed. (Docket No. 12, Ex. C at 1) Upon completion of the follow-up study, the Vanderbilt defendants published an article in the *American Journal of Epidemiology* in 1969, reporting that there was a possible relationship between fetal exposure to radioactive iron and the incidence of childhood cancers. (Docket No. 62, Ex. 5 at 9–10; Docket No. 91, Ex. A at 724)

After the filing of the *Craft* litigation, Vanderbilt tendered the defense of the litigation to St. Paul and requested indemnification for all amounts that St. Paul was obligated to pay under insurance policies issued to Vanderbilt. After discovery was

conducted, it became apparent that the St. Paul insurance policies could not be located by either Vanderbilt or St. Paul.[1] St. Paul initially refused to defend or indemnify Vanderbilt, in part because Vanderbilt had not demonstrated that St. Paul had issued any insurance policies for the relevant time period. (Docket No. 12, Ex. D at 1–2)

In March 1998, Vanderbilt located some documentary evidence that St. Paul had provided insurance coverage at least for the years 1954–56, 1957–58, 1958–61, 1961–63, 1965–1966, 1967–70. (Docket No. 12, Ex. D at 2; Docket No. 91, Ex. D) U.S. Fire provided excess insurance to Vanderbilt beginning in 1965 through at least 1971. (Docket No. 91, Ex. D)

On May 27, 1998, the parties to the *Craft* litigation settled the class action suit for approximately $10 million. (Docket No. 12, Ex. C) As part of that settlement, the Rockefeller Foundation agreed to pay the *Craft* plaintiffs $900,000. Vanderbilt was responsible for the remaining $9.1 million of the *Craft* settlement.

In the *Craft* settlement agreement, the parties agreed that the payment was to cover "any and all claims ... brought or which have been brought or may be brought against [Vanderbilt and Rockefeller Foundation] arising out of, related to, or as a result of, [Vanderbilt's and Rockefeller Foundation's] funding and/or participation of any kind or nature in the TVNP and in the follow-up study, and all the acts, omissions and/or events alleged in the Complaint or First or Second Complaint or in Pretrial Order No. 4." (Docket No. 12, Ex. C at 3)

On November 6, 1998, Judge Nixon issued an Order Approving Distribution of Settlement Fund. (Docket No. 91, Ex. C) Of the approximately $10 million in settlement funds, Judge Nixon allocated $4 million to the battery claims as a result of the administration of the radioactive iron liq-

1. When St. Paul refused to defend Vanderbilt in the *Craft* litigation, Vanderbilt tendered the defense to U.S. Fire.

uid during the TVNP ($3.73 million from Vanderbilt) and $1.25 million to the claims for the wrongful death of children in the 1950s whose mothers had participated in the TVNP study.[2] (Docket No. 91, Ex. C at 2–3)

On January 20, 1999, U.S. Fire filed this declaratory judgment action against Vanderbilt and St. Paul, seeking a determination of the rights and obligations of the parties pursuant to various insurance policies issued by U.S. Fire to Vanderbilt.

On February 24, 1999, St. Paul and Vanderbilt settled their dispute as to St. Paul's duty to indemnify Vanderbilt for the amounts it paid under the *Craft* settlement. (Docket No. 12, Ex. D) Under the terms of the St. Paul settlement agreement, St. Paul agreed to pay Vanderbilt approximately $2 million in defense costs and $2.5million[3] as indemnity under the hospital professional liability coverage for some or all[4] of the policies in effect during five separate and non-consecutive years (1963–1967,1968–1969) of the follow-up study. (Docket No. 116, Ex. 1 at 3–4) St. Paul had determined that an agreement between St. Paul and Vanderbilt that the years of the follow-up study were implicated "would likely place Vanderbilt in a favorable position with U.S. Fire and the excess coverages in effect at the time." (Docket No. 91, Ex. G at 287) Vanderbilt and St. Paul further agreed that "nothing set forth in this Settlement Agreement and Release is intended as or may be construed as an admission of coverage, fault, liability or wrongdoing of any party." (Docket No. 116, Ex. 1 at 6) Thus, beyond the general disclaimer of liability, St. Paul also disclaimed that the policies it provided to Vanderbilt actually covered the *Craft*

claims. In return for St. Paul's payment, Vanderbilt agreed not to seek further indemnity from St. Paul "in the event that any court of competent jurisdiction determines that the payment made by St. Paul ... did not exhaust any coverage which was or may have been provided by St. Paul to Vanderbilt." (Docket No. 116, Ex. 1, at 5)

### SUMMARY JUDGMENT LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). In determining whether the movant has met its burden, the court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to

**2.** The remainder of the settlement was apportioned as follows: (1) approximately $3,000,000 for plaintiffs' attorney's fees and costs; (2) $750,000 for a Special Circumstances Fund; (3) $100,000 for Class Representative Incentive Awards; and (5) approximately $320,000 for a reserve fund. (Docket No. 91, Ex. C)

**3.** Although not spelled out in the St. Paul settlement, it is undisputed that the $2.5 mil-

lion indemnity was based on the $500,000 policy limit for hospital professional liability for each occurrence. *See* Docket No. 62, Ex. 1 at 007.

**4.** The settlement agreement recites that, at some point, St. Paul will "identif[y] the policies that are implicated." (Docket No. 116, Ex. 1 at 4)

summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537–38 (6th Cir.1999) (*citing Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon,* 107 F.3d 1171, 1174–75 (6th Cir.1997). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in his or her favor. *See id.* at 261, 106 S.Ct. 2505.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street,* 886 F.2d at 1479. If the evidence offered by the nonmovant is "merely colorable," "not significantly probative," or is not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505.

## DISCUSSION

### A. Cross–Motions for Summary Judgment on the Issue of Notice

U.S. Fire and Vanderbilt have filed cross-motions for summary judgment on the issue of notice.[5] (Docket Nos. 50, 80) U.S. Fire contends that even if this court were to find that its policies were implicated by Vanderbilt's settlement in the *Craft*

litigation, it is still not required to indemnify Vanderbilt because Vanderbilt failed to notify U.S. Fire of the events underlying the *Craft* litigation until April 1994. Vanderbilt contends that notice in 1994 was proper and, even if it were not proper, U.S. Fire was not prejudiced by the delay in notice.

█ In evaluating U.S. Fire's notice argument, this court must first determine whether Vanderbilt's notice to U.S. Fire in 1994 was timely. Recently, the Tennessee Supreme Court decided in *Alcazar v. Hayes,* 982 S.W.2d 845, 856 (Tenn.1998), that "once it is determined that the insured has failed to provide timely notice in accordance with the insurance policy, it is presumed that the insurer has been prejudiced by the breach. The *insured,* however, may rebut this presumption by *proffering competent evidence* that the insurer was not prejudiced by the insured's delay." *Alcazar,* 982 S.W.2d at 856 (emphasis added). While "less sympathetic" to the insured, such an approach was adopted "since the insured bears sole responsibility for breaching a term of the contract that was intended to preserve fairness to the insurer." *Id.*

The U.S. Fire policies provide:

"[u]pon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as reasonably practicable to the company or any of its authorized agents. Such notice shall contain particulars sufficient to identify the insured and the fullest information obtainable at the time.

The insured shall give like notice of any claim made on account of such occurrence. If legal proceedings are begun the insured, when requested by the company, shall forward to it each paper thereon, or a copy thereof, received by

---

5. Vanderbilt has opposed U.S. Fire's motion to amend its complaint to raise this issue explicitly. (Docket Nos. 119, 121) However, Vanderbilt concedes that the notice issue is before the court in the cross-motions for summary judgment (Docket No. 121 at 3–4), and the court would have granted U.S. Fire's motion to amend as to Vanderbilt, if it had to reach that motion.

the insured or the insured's representatives, together with copies of reports of investigations made by the insured with respect to such claim proceedings." (Docket No. 62, Ex. 1 at ¶ E)

U.S. Fire contends that Vanderbilt's notice in 1994 was not timely notice under the policies because it was not "as soon as reasonably practicable." U.S. Fire argues that notice should have been given in 1969, when Vanderbilt published its findings from the follow-up study in the *American Journal of Epidemiology,* because the study "identified the heightened incidence of cancer in the exposed children, and concluded that there was an overall 'cause and effect' relationship between the ingestion of the radioactive isotopes and the children's cancerous conditions." (Docket No. 51 at 1).

Vanderbilt contends that U.S. Fire's argument fails as a matter of law because (1) U.S. Fire waived this argument when it refused to defend or indemnify Vanderbilt in the *Craft* litigation; (2) U.S. Fire was not entitled to notice in 1969; and (3) U.S. Fire has not articulated any specific prejudice resulting from notice in 1994. (Docket No. 82 at 3–4) Vanderbilt's contentions will be analyzed in this order.

(1) Vanderbilt contends that U.S. Fire waived Vanderbilt's compliance with the notice requirement because, when U.S. Fire was notified of the *Craft* litigation in

1994, U.S. Fire did not undertake any investigation, refused to defend [6] or indemnify Vanderbilt, and failed to raise the notice issue until U.S. Fire filed suit in January 1999. When Vanderbilt gave U.S. Fire notice in 1994, U.S. Fire's response letters stated that it accepted notice "under a full reservation of rights position" and acknowledged receipt of the *Craft* litigation without a "waiver of any rights." (Docket No. 84, Ex. B at 10, 12) In oral argument, Vanderbilt asserted that U.S. Fire's reservation of rights was inadequate to preserve the notice defense because it was merely a general reservation of rights. *See also* Docket No. 82 at 23 n. 27. In its brief, Vanderbilt argues that, under Tennessee law, U.S. Fire's reservation of rights was not sufficient because it did not inform Vanderbilt of its bases for refusing to defend and indemnify Vanderbilt in the *Craft* litigation. (Docket No. 82, at 23 n. 27, *citing Allstate Ins. Co. v. Dixon,* 1991 WL 79549 (Tenn.Ct.App. May 17, 1991) and *Richards Mfg. Co. v. Great Am. Ins. Co.,* 773 S.W.2d 916 (Tenn.Ct.App.1988)).

In *Allstate Ins. Co. v. Dixon,* the court stated that there must be proper notice of the insurer's reservation of rights in order for the insurer to avoid waiver. The court found that, "[f]or the notice to be sufficient, however, it must fairly and adequately inform the insured of the insurer's position." *Dixon,* 1991 WL 79549, at *5.

**6.** At the outset, Vanderbilt has consistently argued that U.S. Fire had an obligation to defend Vanderbilt in the *Craft* litigation. However, the U.S. Fire policies explicitly state that "[w]ith respect to any occurrence not covered by the underlying [St. Paul] policies listed in Schedule A hereof or any other underlying insurance collectible by the insured ..., the company shall: (a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof ...." (Docket No. 62, Ex. 1 at ¶ II) U.S. Fire only had a defense obligation in the event that the "occurrence" was not covered by the St. Paul policies. As the excess insurer, U.S. Fire only had an obligation to indemnify once it had been determined that the St. Paul policies had been exhausted.

Vanderbilt argues that a document sent by U.S. Fire to Vanderbilt entitled "A Proposal

for Comprehensive Catastrophe Liability Protection including Defense Coverage," obligated U.S. Fire to defend Vanderbilt in the *Craft* litigation. (Docket No. 62, Ex. 3) However, the U.S. Fire proposal did not supercede the defense provisions set forth in the actual U.S. Fire policies. *See* Docket No. 62, Ex. 3 at 25 ("The Defender provides legal defense ... in all these areas left unguarded by your primary underlying insurance—areas insured under the maximal terms of the Defender.... [T]he policy issued supercedes anything contained herein. This analysis of coverage is in general terms. Refer to your policy for exact wording.").

Vanderbilt has failed to demonstrate that U.S. Fire had any duty to defend Vanderbilt in the *Craft* litigation.

*See also Richards Mfg. Co. v. Great Am. Ins. Co.,* 773 S.W.2d 916, 919 (Tenn.Ct. App.1988) (same). However, both of these cases cited by Vanderbilt for this proposition involve primary carriers, not excess carriers, and the court finds this argument unpersuasive.

In a more factually analogous case, *St. Paul Fire and Marine Ins. Co. v. Children's Hosp. Nat'l Med. Center,* 670 F.Supp. 393 (D.D.C.1987), the insurer, St. Paul, had both primary and excess policies with the insured. In its role as the primary carrier, St. Paul accepted the defense of the claims without any reservation of rights and did not disclaim coverage under its excess policies until the verdict in the underlying medical malpractice case had been rendered. *See St. Paul Fire and Marine Ins. Co.,* 670 F.Supp. at 402. The issue before the court was whether St. Paul had a duty to disclaim coverage or reserve rights under its excess policies before judgment was rendered in the underlying medical malpractice suit. *Id.* The court found that, "prior to the time the verdict was rendered, St. Paul had no such duty to speak with respect to the excess policies." *Id.* Under this authority, U.S. Fire, as the excess insurer, had no duty to make a specific reservation of rights, even when it was notified of the *Craft* litigation in 1994. Vanderbilt has not established that U.S. Fire waived its notice defense when it failed to make a specific reservation of rights as to notice upon notification of the *Craft* litigation in 1994.

■ (2) Apart from its waiver argument, Vanderbilt contends that it was not required to give notice·to U.S. Fire in 1969.

First, although the U.S. Fire excess policies required that the insured notify U.S. Fire "as soon as practicable," Vanderbilt contends that notifying U.S. Fire in 1969 would have been a "useless act." (Docket

No. 82 at 30–31) The term "'as soon as practicable' imposes a duty on the insured to give notice when he becomes, or should become, aware of facts which would suggest to a reasonably prudent person that the event for which coverage is sought might reasonably be expected to produce a claim against the insurer." *Reliance Ins. Co. v. Athena Cablevision Corp.,* 560 S.W.2d 617, 618 (Tenn.1977); *see also Lee v. Lee,* 732 S.W.2d 275, 276 (Tenn.1987). However, "[b]eing practicable about a matter means eliminating the purely formal or useless acts which serve no real or valid purpose." *Reliance Ins. Co.,* 560 S.W.2d at 618. In *Reliance Ins. Co.,* the·court found that the insured's failure to notify its insurer was excused because, until the lawsuit was actually filed, the insured had good reason to believe that no claim would be made against it.[7] *Id.* Vanderbilt argues that because U.S. Fire took no action for five years when it was·notified in·1994, notifying U.S. Fire in 1969 would not have prompted U.S. Fire to act any differently. (Docket No. 82 at 30–31)

U.S. Fire argues that notice by Vanderbilt in the late 1960s would not have been a useless act because:

> "reasonable, low-level excess carriers can be counted on to gather facts when faced with a massive and complex tort which may cause widely distributed and very expensive injuries sufficient to penetrate that carrier's layer.... Such carriers can also be counted upon to contact, work with, and monitor the inquiries of the primary carrier beneath them.... A reasonable insurer might, if appropriate, interview people knowledgeable about what caused the deaths in the first place; interview those who conducted the follow-up study; interview those who observed that study; obtain, review, and preserve documents regarding the radiation study; obtain,

7. In *Reliance Ins. Co.,* an employee of a company was killed while assisting in the construction of a tower for a cable company. The construction company's contract with the cable company provided that the construction company would carry all necessary insurance coverage and would hold the construction company harmless for all claims arising out of the construction of the tower. *See Reliance Ins. Co.,* 560 S.W.2d at 617.

review, and protect documents pertaining to the follow-up study; and take sworn statements from a variety of people before their memories fade (or fade even further)." (Docket No. 107 at 12) Vanderbilt contends that U.S. Fire did none of these things after it was notified of the Craft litigation in 1994 and that, therefore, earlier notification would have been a "useless act." U.S. Fire contends that, in light of the circumstances at that late date, it took entirely appropriate actions as an excess carrier.

After it was notified in April 1994, U.S. Fire accepted notice and acknowledged receipt of the *Craft* litigation under a reservation of rights. (Docket No. 84, Ex. B at 10, 12) In a letter dated June 22, 1994, U.S. Fire informed Vanderbilt that, because U.S. Fire's policies provided excess coverage, "[t]hese policies are not obligated to respond in any way until the underlying coverage has been exhausted by the payment of settlements and judgements." (Docket No. 84, Ex. B at 14) However, U.S. Fire requested that Vanderbilt continue to provide it with information relating to any significant developments in the *Craft* litigation. (Docket No. 84, Ex. B at 15) U.S. Fire also repeatedly informed Vanderbilt that it was waiting for a coverage analysis from St. Paul (which was not provided to U.S. Fire until June 1998) before it could respond to Vanderbilt's request for coverage. (Docket No. 84, Ex. B at 39, 40, 43, 44) When U.S. Fire provided Vanderbilt with its own coverage analysis in June 1998, U.S. Fire indicated that it needed more information before it could decide whether U.S. Fire was obligated to indemnify Vanderbilt for a portion of the *Craft* settlement and again reserved its rights. (Docket No. 84, Ex. B at 46–50)

Vanderbilt next argues that it could not have given notice to U.S. Fire in 1969 because it did not have notice of any claim in 1969. (Docket No. 82 at 31–38) Specifically, Vanderbilt contends that, pursuant to U.S. Fire's policies, it was only required to give U.S. Fire notice "[u]pon the happening of an occurrence reasonably likely to involve [U.S. Fire]." (Docket No. 62, Ex.

1 at ¶ E) Thus, according to Vanderbilt, because there is no evidence in the record that Vanderbilt had any expectation that it would be subject to liability after the follow-up study was conducted, there was no obligation on its part to give notice to U.S. Fire. (Docket No. 82 at 37) Vanderbilt points to the deposition testimony of the authors of the *American Journal of Epidemiology* article, in which the authors testified that the follow-up study did not conclude there was a cause and effect relationship and that the findings were not considered dramatic. (Docket No. 82 at 31) However, the introductory paragraph of the article, "Long Term Effects of Radioactive Iron Administered During Human Pregnancy," states that "[f]or 634 exposed children, one case of leukemia and two cases of sarcoma were discovered. No malignancies occurred in the 655 children in the comparison group. This represents a small, but *statistically significant* increase . . ., and is consistent with radiobiologic experience." (Docket No. 91, Ex. A at 723) While the authors of the article may have testified years after the fact in the midst of litigation that these findings were not dramatic, the potential for liability arising out of the experiments seems obvious and should have been obvious, especially to a sophisticated institution like Vanderbilt.

Furthermore, it is undisputed that in December 1985, Vanderbilt received a request from the United States Department of Energy for information about the radioactive iron experiments conducted by Vanderbilt in the 1940s for use in a Congressional hearing at which some of the participants in the 1940s study would testify. Vanderbilt informed its in-house counsel by memorandum of the Department of Energy's request. (Docket No. 81 at ¶¶ 20–22) Vanderbilt had notice of potential claims long before 1994, when it gave notice to its insurers.

Finally, Vanderbilt argues that, even if it knew in 1969 of potential liability as a result of its radioactive experiments, it was

still only required to give notice to U.S. Fire in 1969 if Vanderbilt expected any claim to exceed the limits of the underlying St. Paul policies ($500,000).[8] In support, Vanderbilt submits evidence from St. Paul's claims files for Vanderbilt that demonstrates that no claims against Vanderbilt from 1965–1969 ever exceeded $100,000. (Docket No. 82 at 42) Vanderbilt also cites to reported Tennessee wrongful death verdicts from 1965–1969, none of which exceeded $200,000. (Docket No. 82 at 43–44)

The evidence Vanderbilt puts forth is insufficient to support its argument. The verdicts cited generally involve one claimant. The follow-up study indicated that there had been four deaths. Thus, if each potential claimant was awarded $125,000 (an amount well within the range for wrongful death awards from Vanderbilt's own evidence), it was likely that the St. Paul policy limits would have been exhausted. In addition, Vanderbilt knew that 800 pregnant women were involved in the TVNP and that the number of claimants could be expected to grow. *See* Docket No. 107 at 11.

■ (3) Vanderbilt next argues that U.S. Fire did not suffer any prejudice from any alleged failure by Vanderbilt to give notice before 1994. U.S. Fire argues that it has been prejudiced because

"[i]n the more than twenty-five years since Vanderbilt's researchers learned of the deaths of the exposed children, most of the medical records and documentary evidence relating to either the 1940's experiments, as well as the 1960's follow up survey, have disappeared or been destroyed. Most of the original authors and individuals with knowledge of the 1940's radioactive iron experiments, including the designers of the study and the individuals who administered the radioactive isotopes, are dead. Vanderbilt is now unable even to locate copies of

the insurance policies which are primary to U.S. Fire's coverage." (Docket No. 51 at 8)

U.S. Fire further argues that if the depositions of the authors of the *American Journal of Epidemiology* article had been taken earlier, they may have provided more useful information. During Dr. Hagstrom's deposition in 1997 she indicated that she did not remember 130 times. In his 1997 deposition, Dr. Darby responded that he could not remember 82 times. (Docket No. 109, Ex. A)

If notice was untimely, prejudice to U.S. Fire is presumed, and Vanderbilt must offer competent evidence that U.S. Fire was not prejudiced. *See Alcazar,* 982 S.W.2d at 856. Vanderbilt has failed to do so. To this day, the underlying St. Paul policies have not been able to be reconstructed so that the precise terms of the coverage to which U.S. Fire provided excess coverage could be determined. With the potential for such significant liability, the excess carrier would have monitored, if not participated in, the factual investigation, as asserted by U.S. Fire in its briefs. The loss of witnesses and documents makes that factual investigation by anyone impossible.

For its failure to comply with the notice provision in the U.S. Fire policies, Vanderbilt is not entitled to seek indemnification from U.S. Fire for the *Craft* settlement. U.S. Fire's motion for summary judgment on the notice issue is granted, and Vanderbilt's motion for summary judgment on that issue is denied.

The ruling on this issue is dispositive of the case, but the court will analyze and rule on the other motions in the interest of overall judicial economy.

---

8. Vanderbilt contends that, as specified in the 1965 and 1968 U.S. Fire policies, the underlying "aggregate policy limit" for hospital professional coverage provided by St. Paul is $500,000. (Docket No. 82 at 39 n. 41) However, in the 1965 U.S. Fire policy, there is no aggregate limit; rather, there is a $500,000 bodily injury limit for each occurrence under the hospital professional liability coverage. There is only a $500,000 aggregate limit for hospital professional liability listed in the 1968 U.S. Fire policy.

## B. *Vanderbilt's Motion for Summary Judgment*

Vanderbilt seeks summary judgment on U.S. Fire's contractual obligation to indemnify Vanderbilt for the amounts Vanderbilt paid toward the *Craft* settlement. (Docket No. 60 at 2) Vanderbilt contends that U.S. Fire is liable for the remainder of the *Craft* settlement—approximately $6.6 million.

### 1. *Concurrent Causation Doctrine*

Vanderbilt argues that U.S. Fire is responsible for the remainder of the *Craft* settlement because U.S. Fire provided excess insurance during the period of the follow-up study in the 1960s, and the follow-up study was a concurrent cause of the damages to the *Craft* plaintiffs. Vanderbilt posits that the follow-up study was a concurrent cause of these damages because "(1) the *Craft* Plaintiffs based a substantial number of their alleged injuries on the 1964–69 follow-up study as well; and (2) the *Craft* Plaintiffs under the *Craft* Settlement participated in both the 1945–47 nutrition study and the 1964–69 follow-up study." (Docket No. 60 at 40)

■ Under the concurrent causation doctrine, "coverage under a liability policy is equally available to an insured whenever an insured risk constitutes a concurrent proximate cause of the injury." (Docket No. 60, at 39, *quoting Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn.1991)) *See also Planet Rock, Inc. v. Regis Ins. Co.*, 6 S.W.3d 484, 491–93 (1999).

In *Allstate Ins. Co.*, a homeowner's insurer filed a declaratory judgment action to determine whether its policy provided coverage for injuries sustained by the insured's friend while assisting the insured to fix his truck. While the insured and his friend were replacing the truck's brake pads, a pan of oil ignited and the insured spilled burning oil on his friend. Although the homeowner's policy excluded any losses arising out of the "maintenance" of motor vehicles, the court held that the insurer should not be relieved from responsibility for the injuries sustained when the insured spilled oil on his friend and that coverage should be provided "where a nonexcluded cause is a substantial factor in producing the damage or injury, even though an excluded cause may have contributed in some form to the ultimate result and, standing alone, would have properly invoked the exclusion contained in the policy." *Id.* at 887. The court further held that

> "an insurer should not be excused from its obligation under a homeowner's policy unless it has been determined that the loss being complained of did not result in *substantial part* from a risk for which it provided coverage and collected a premium. We reject the contention that there can be no coverage when the chain of events leading to the ultimate harm is begun by an excluded risk, concluding instead that coverage cannot be defeated simply because excluded risks might constitute an additional cause of the injury." *Id.* at 888 (emphasis added).

■ Although Vanderbilt argues that the 1945–47 nutrition study and the 1964–69 follow-up study are concurrent causes of the injuries to the plaintiffs, the follow-up study cannot reasonably be seen as an additional cause of the batteries suffered by the plaintiffs during the TVNP or the children's deaths in the 1950s. According to the *Craft* plaintiffs, in conducting the follow-up study without revealing the reason for the study, Vanderbilt violated the privacy rights of those individuals who participated in the follow-up study. The *Craft* plaintiffs further alleged that Vanderbilt had negligently conducted the follow-up study in that it did not disclose to the study participants that they may have been exposed to radiation and exposed individuals should seek medical monitoring for health risks associated with radiation exposure. These factual allegations are far different from the wrongful death and battery claims stemming from the TVNP. Whether or not the plaintiffs participated in both the TVNP and the follow-up study, these events are separate and not concurrent causes of the injuries to the *Craft*

plaintiffs.[9] Vanderbilt cannot establish that the follow-up study was a "substantial factor in producing the damage or injury" that occurred as a result of the TVNP in the 1940s. *Watts,* 811 S.W.2d at 887. The concurrent causation doctrine does not apply.

### 2. Allocation of All Losses to Years of U.S. Fire Coverage

■ Vanderbilt argues that U.S. Fire is liable for the remainder of the *Craft* settlement because Vanderbilt, as the insured, is permitted to allocate all of its losses to the years of U.S. Fire's excess coverage under the "all sums doctrine."[10] Vanderbilt claims it may allocate all of its losses—the remaining $9.1 million of the *Craft* settlement—to any year in which it had insurance, "even if part of the losses are attributable to periods in which the insured did not have coverage in effect." (Docket No. 60 at 42) As Vanderbilt characterizes the "all sums" doctrine, "once the liability of a given insurer is triggered, it is irrelevant that additional exposure or injury occurred

at times other than when the insurer was on the risk" and "[t]he insurer in question must bear potential liability for the entire claim." *J.H. France Refractories Co. v. Allstate Ins. Co.,* 534 Pa. 29, 626 A.2d 502, 508 (1993). Vanderbilt claims that U.S. Fire's policies were "triggered" by the 1960s follow-up study.

The *J.H. France* case, as well as five other cases Vanderbilt cites for the "all sums" approach,[11] involve asbestos-related injuries.[12] Although in *J.H. France* the court found that the insured was allowed to select the policy or policies under which it was to be indemnified, the court had determined that one "occurrence", for purposes of triggering liability of the insurer, included any of the three stages of the development of an asbestos-related illness—exposure, progression, or manifestation—because any one of the developments would constitute "injury" for purposes of the insurance policy.

Here, Vanderbilt's ultimate liability in the *Craft* litigation was based on the bat-

9. Vanderbilt appears to concede that the wrongful death claims which were settled for $1.25 million are not attributable to the follow-up study. (Docket No. 60 at 41 n. 29) However, Vanderbilt still argues that U.S. Fire is responsible for the remainder of the *Craft* settlement because it recovered more than the $1.25 million earmarked for the wrongful death claims—$900,000 from Rockefeller and $2.5 million from St. Paul.

10. Although none of the cases cited in support of Vanderbilt's "all sums" argument are from Tennessee courts, Vanderbilt contends that the "all sums" approach is consistent with Tennessee law. *See Brewer v. Occidental Fire & Cas. Co.,* 219 Tenn. 584, 412 S.W.2d 210 (1967); *Osborne v. Hartford Acc. & Indem. Co.,* 63 Tenn.App. 518, 476 S.W.2d 256 (1971).

11. As demonstrated in these asbestos-related cases, the theory behind the "all sums" approach relates to the continuous nature of the injury that triggers all insurance policies. *Keene Corp. v. Insurance Co. of North Am.,* 667 F.2d 1034 (D.C.Cir.1981); *Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.,* 10 F.Supp.2d 856 (N.D.Ohio 1998) (finding that "St. Paul's duty to defend and indemnify is triggered at any point along the continuum of

injury from the claimant's initial exposure to diagnosis or death."); *Armstrong World Indus., Inc. v. Aetna Cas. & Surety Co.,* 45 Cal. App.4th 1, 57, 52 Cal.Rptr.2d 690 (1996) ("It is irrelevant that only part of the asbestos-related disease developed during any single policy period or during a period in which the manufacturer had no insurance. The logical consequence of this ruling is that the policyholder is covered (up to the policy limits) for the full extent of its liability and need not pay a pro rata share."); *Owens–Corning Fiberglas Corp. v. American Centennial Ins. Co.,* 74 Ohio Misc.2d 183, 660 N.E.2d 770 (1995).

12. Four other cases cited by Vanderbilt involve environmental pollution where the courts found that each of the policies had been triggered during the period of pollution because there was a continuous occurrence (injury) as a result of the repeated pollution of the environment. *See Public Serv. Co. of Colorado v. Wallis and Cos.,* 955 P.2d 564, 572 (Colo.App.1997), *rev'd,* 986 P.2d 924, 1999 WL 711848 (Colo. Sept.13, 1999); *Monsanto Co. v. C.E. Heath Compensation and Liability Ins. Co.,* 652 A.2d 30 (1994); *Rubenstein v. Royal Ins. Co. of America,* 44 Mass.App.Ct. 842, 694 N.E.2d 381 (1998); *American Nat. Fire Ins. Co. v. B & L Trucking and Const. Co.,* 134 Wash.2d 413, 951 P.2d 250 (1998).

tery claims stemming from 1945–1947, when the pregnant women in the TVNP were fed radioactive iron, and the claims of the wrongful death of children in the 1950s. The fact that the *Craft* plaintiffs also alleged injuries based on Vanderbilt's follow-up study does not establish that the follow-up study was a continuation of the injuries resulting from the TVNP. The "all sums" approach simply does not fit the facts of this case.

Vanderbilt further argues that U.S. Fire cannot refuse to indemnify on the ground that "Vanderbilt cannot establish that bodily injury to members of the *Craft* class occurred during the policy periods." (Docket No. 1 at ¶ 22) Vanderbilt contends that it is not required to demonstrate "actual injury" to the *Craft* plaintiffs in order to seek indemnity from U.S. Fire. (Docket No. 60 at 60) Although not citing to any Sixth Circuit or Tennessee law to bolster its argument, Vanderbilt asks this court to follow "the general rule that if an insured settles an underlying claim prior to verdict, it must show that it settled an otherwise covered loss in 'reasonable anticipation of liability.'" *U.S. Gypsum Co. v. Admiral Ins. Co.*, 268 Ill.App.3d 598, 205 Ill.Dec. 619, 643 N.E.2d 1226, 1244 (1994). Regardless of whether this rule is followed in Tennessee, Vanderbilt concedes that it still must demonstrate that a "covered event" took place during the period covered by the U.S. Fire policies. (Docket No. 60 at 63) The U.S. Fire policies explicitly state that "[t]his policy applies only to occurrences happening anywhere during the policy period." (Docket No. 91, Ex. H at § IV) As defined in the U.S. Fire policies, an "'occurrence' means either an ac-

cident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period." (Docket No. 91, Ex. H at § D)

According to Vanderbilt, an "accident" that triggered U.S. Fire's excess policies did occur during the policy period because the follow-up study took place from 1964–1969—the years covered by the U.S. Fire policies. (Docket No. 60 at 71) Specifically, Vanderbilt argues that the *Craft* plaintiffs "alleged that Vanderbilt committed separate and discrete acts of negligence, and other alleged tortious conduct during the period of the 1964–1969 follow-up study, by improperly failing to render professional services during the period of the follow-up study ...." (Docket No. 60 at 73) The *Craft* plaintiffs alleged civil rights violations and the commission of intentional torts during the follow-up study.[13] However, even if Vanderbilt did commit these acts during the follow-up study, they cannot be viewed as a "continuation" of the earlier acts. They are entirely separate from giving radioactive iron to pregnant women in the 1940s without their knowledge or consent.

Vanderbilt has provided no support for its proposition that U.S. Fire is liable for the remainder of the *Craft* settlement merely because the plaintiffs in the *Craft* litigation alleged certain claims that encompassed the period of the U.S. Fire excess policies. After the *Craft* settlement agreement was entered, Judge Nixon allocated the entire settlement money to the battery claims from the 1940s and the wrongful death claims from the 1950s.[14]

---

13. In the First Amended Complaint filed in the *Craft* litigation, the plaintiffs alleged 16 causes of action. (Docket No. 62, Ex. 5) The following causes of action can reasonably be read to refer to alleged injuries that resulted from the follow-up study: (1) Claim One: Violation of Civil Rights; (2) Count Two: Conspiracy to Violate Civil Rights; (3) Count Four: Medical Malpractice; (4) Count Six: Negligence; (5) Claim Eleven: Intentional or Reckless Infliction of Emotional Distress; and

(6) Count Fifteen: Invasion of Privacy. (Docket No. 62, Ex. 5)

14. Furthermore, U.S. Fire's policies have a specific exclusion for assault and battery. As defined in the U.S. Fire policies, personal injury includes only "assault and battery not committed by or at the direction of the insured, unless committed for the purpose of preventing or eliminating danger in the operation of aircraft or for the purpose of protect-

No money was assigned to liability for the 1960s follow-up study, when U.S. Fire carried excess coverage for Vanderbilt. *See* Docket No.43, Ex. A.

 During oral argument, Vanderbilt asserted that it was not bound by Judge Nixon's Order Approving Distribution of Settlement Fund because it was not given notice or an opportunity to be heard with reference to the allocation, in violation of fundamental due process. But Vanderbilt knowingly surrendered any right it had to participate in that process. The *Craft* settlement agreement recites:

> "[a]llocation of the Settlement Fund to or among the Plaintiff Class shall be the responsibility of the Court, after receiving recommendations of Class Counsel. Inasmuch as all claims against Settling Defendants [15] (other than the claims of timely opt-outs) will have previously been dismissed with prejudice, the Settling Defendants shall have no standing to comment upon the allocation plan, nor to participate in recommendations to the Court, nor to otherwise dictate, influence or affect any aspect of the allocations to or among Plaintiff Class Members." (Docket No. 57, Ex. 4 at 10)

Vanderbilt's counsel, Alfred Wilcox, signed the *Craft* settlement agreement. (Docket No. 57, Ex. 4 at 15) Indeed, the hearings held before Judge Nixon on the preliminary approval and the final approval of the *Craft* settlement demonstrate that the motions for approval were joint motions in which Vanderbilt joined. (Docket No. 116, Ex. 3 at 10; Ex. 4 at 3)

And Judge Nixon did not act arbitrarily in allocating the settlement fund to the battery claims and the wrongful death claims. During the hearings held in connection with the preliminary and final approval of the class action settlement and the allocation of the settlement fund, class members addressing the court focused exclusively on the physical injuries they believed they had suffered as a result of the 1940s TVNP. The *Craft* plaintiffs did not address the 1960s follow-up study in the context of the injuries they suffered. (Docket No. 116, Exs. 3–5) Judge Nixon's allocation of the *Craft* settlement was based on the record that had been developed over the four years of the *Craft* litigation. On the basis of the record, he allocated the settlement funds entirely to the liability for acts that had occurred in the 1940s and the 1950s.

Vanderbilt has not convinced this court that it should not be bound by Judge Nixon's allocation. Vanderbilt suffered no loss as a result of the follow-up study that took place while U.S. Fire's policies were in effect. Thus, Vanderbilt cannot demonstrate that U.S. Fire is obligated to indemnify Vanderbilt for the remainder of the *Craft* settlement.[16] Accordingly, Vanderbilt's motion for summary judgment is denied.

### C. *St. Paul's Motion to Dismiss*

U.S. Fire included St. Paul as a defendant in this declaratory judgment action because U.S. Fire's policies are excess to St. Paul's primary coverage for claims against Vanderbilt for certain years. Therefore, U.S. Fire's liability to Vanderbilt is dependent upon coverage and ex-

---

ing the property of the insured or the person or property of others." (Docket No. 88 at 26)

**15.** As defined in the *Craft* settlement agreement, the "Settling Defendants" are Vanderbilt University, Vanderbilt University Medical Center, and the Rockefeller Foundation. (Docket No. 57, Ex. 4 at 4)

**16.** Vanderbilt also argues that U.S. Fire is bound by the allocation of damages made in the St. Paul/Vanderbilt settlement. (Docket No. 113, at 10–11, *citing United States Fidelity & Guar. Co. v. Treadwell Corp.,* 58 F.Supp.2d 77, 107 (S.D.N.Y.1999)). But the *Treadwell* case is not binding upon this court, and there is authority holding otherwise. *See* Allan D. Windt, 1 *Insurance Claims & Disputes: Representation of Insurance Companies and Insureds* 455 (3rd ed.1995); *Kaiser Foundation Hospitals v. North Star Reinsurance Corp.,* 90 Cal.App.3d 786, 792–794, 153 Cal.Rptr. 678 (1979).

haustion issues related to the St. Paul policies. St. Paul has moved to be dismissed from this case because it has settled with Vanderbilt and asserts that U.S. Fire has no claim against St. Paul. (Docket No. 20)

In light of the fact that U.S. Fire's claims [17] against St. Paul only arise if U.S. Fire is found liable to Vanderbilt and this court has held that U.S. Fire has no liability to Vanderbilt, St. Paul's Motion to Dismiss will be granted.

An appropriate Order will enter.

## ORDER

U.S. Fire's Motion for Summary Judgment on the issue of notice (Docket No. 50) is GRANTED. Vanderbilt's Cross–Motion for Summary Judgment on the issue of notice (Docket No. 80) is DENIED. U.S. Fire's Motion for Summary Judgment on the issue of exhaustion (Docket No. 97) is DENIED as moot. U.S. Fire's Motion for Leave to Amend its Complaint (Docket No. 119) is DENIED as moot. St. Paul's Motion to Dismiss and/or for Summary Judgment (Docket No. 20) is GRANTED. U.S. Fire's Motion for Review of Magistrate Judge Griffin's June, 14 1999 Order (Docket No. 36) is DENIED as moot.

It is so ORDERED.

---

17. These claims of indemnity and contribution, breach of duty of good faith, and tortious interference are elucidated in U.S. Fire's response to St. Paul's Motion to Dismiss (Docket No. 27) and the Proposed Amended Complaint (Docket No. 121, Ex. A).