**WELLONS, INC., Plaintiff,**

v.

**LEXINGTON INSURANCE COMPANY, Defendant.**

**Civil Action No. 1:10–CV–1799–WCO.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 21, 2013.

Christina M. Baugh, Shattuck Ely, Stephen Thomas La Briola, Fellows Labriola LLP, Atlanta, GA, for Plaintiff.

Catherine Salinas Acree, Christopher B. Freeman, Walter Holloway Bush, Jr., Carlton Fields, PA, Atlanta, GA, for Defendant.

### *ORDER*

WILLIAM C. O'KELLEY, Senior District Judge.

The captioned case is before the court for consideration of defendant's motion for summary judgment [41] and plaintiff's motion for summary judgment [43].[1]

---

1. On March 7, 2013, the court held a hearing where the parties orally presented their arguments on the summary judgment motions.

**1230** 

## I. Factual Background [2]

Plaintiff Wellons, Inc. ("Wellons") is a privately owned business in Vancouver, Washington, that manufactures and installs capital equipment for the forest product industry. (Pl.'s Facts ¶ 1.) It has between 350–400 employees across its various related companies. (Def.'s Facts ¶ 1.) Plaintiff entered into two contracts with Langboard Industries, Inc. ("Langboard"), a company located in Quitman, Georgia that makes oriented strand board ("OSB") for use in home construction and flooring. (*Id.* at ¶ 3.)

In the first agreement, the "Purchase Agreement" dated October 21, 2002, plaintiff agreed to design and provide two Dryer Energy and Thermal Oxidation ("DETOX") systems to produce heat energy for the OSB production process. (*Id.* at ¶ 4.) According to Langboard, the systems were to accomplish three tasks: (1) provide sufficient heat energy to power the OSB production process; (2) incinerate pollutants generated by the OSB production process; and (3) produce sufficient heat to power a boiler and turbine so that Langboard could serve as a co-generator of electricity to be sold to Georgia Power. (*Id.* at ¶ 5.) The total amount of the Purchase Agreement was $13.7 million. (*Id.* at ¶ 6.) In the second agreement, the "Construction Agreement" dated October 8, 2003, plaintiff agreed to erect and install the DETOX systems. The total amount of the Construction Agreement was $3 million. (*Id.* at ¶ 7.)

Defendant Lexington Insurance Company ("Lexington") issued to plaintiff a commercial general liability insurance policy, Policy number 4134867, with a policy period covering September 1, 2005 to September 1, 2006 (the "CGL Policy"). The CGL Policy has a per occurrence limit of liability of $1 million. (*Id.* at ¶ 2; Pl.'s Facts ¶ 4.) Defendant also issued to plaintiff a commercial general liability insurance policy with a policy period covering September 1, 2004 to September 1, 2005 (the "2004 CGL Policy"). In addition, defendant issued to plaintiff an umbrella liability insurance policy, Policy number 0880462, for the policy period covering September 1, 2005 to September 1, 2006 (the "Umbrella Policy"). The policy limit of the Umbrella Policy is $10 million. (Def.'s Facts ¶ 2; Pl.'s Facts ¶ 5.) The CGL Policy is listed as underlying insurance to the Umbrella Policy. (Def.'s Facts ¶ 2.)

On November 20, 2004, during the construction phase, a tube bundle collapsed causing extensive property damage. (*Id.* at ¶ 8.) Both DETOX systems ultimately were placed in service by June 2005. (*Id.* at ¶ 9.) On September 23, 2005, plaintiff, through its insurance agent, provided defendant with notice of a claim under the 2004 CGL Policy involving the tube bundle collapse. (*Id.* at ¶ 10.) Defendant assigned claim number 030–207244 to this claim and issued a reservation of rights letter to plaintiff regarding the claim on September 30, 2005. Defendant sent another reservation of rights letter on September 18, 2007, following its receipt of the summons and complaint in *Langboard v. Wellons*, Civil Action No. 07–SV–17, which was filed in the State Court of Brooks County, Georgia ("Langboard I"). Langboard I related to the tube bundle collapse claim. (*Id.* at ¶ 11.) Defendant ultimately paid its policy limits under the 2004 CGL Policy in settlement of Langboard I. (*Id.* at ¶ 12.)

2. These are undisputed facts culled from defendant's statement of undisputed material facts ("Def.'s Facts"), plaintiff's objections and responses thereto, plaintiff's statement of undisputed material facts ("Pl.'s Facts"), defendant's objections and responses thereto, and various depositions and affidavits.

The superheater is a component of the boiler and is the last section of the boiler where steam passes before being sent to the turbine. In February 2006, after the DETOX systems had been in operation for some time, leaks developed in the superheater portion. (*Id.* at ¶ 13.) Plaintiff determined that the leaks had developed through expansion and contraction of the header in the superheater, for which inadequate clearance had been provided. (*Id.* at ¶ 14.) Plaintiff retained Hunt Construction ("Hunt") to assist with the modification of the superheater header to enable it to be lifted and the leaks repaired and to perform the seal welds.[3] (*Id.* at ¶ 15.)

After Hunt completed the repairs in early March 2006, testing revealed leaks in a substantial number of the joints that were seal welded. (*Id.* at ¶ 16.) Hunt repaired the leaks and left the job site on March 8, 2006, and Langboard put the superheater back into service. (*Id.* at ¶ 17.) Approximately two weeks later, one of the tubes completely severed. (*Id.* at ¶ 18.) Plaintiff contends that Hunt's repair work caused the failure of the severed tube. (*Id.* at ¶ 19.)

On April 4, 2006, plaintiff received a request from Langboard for a new superheater to be designed and installed at its facility at Quitman due to the fact that "the condition of the current Superheater is not conducive to long term operation." (*Id.* at ¶ 20.) Plaintiff understood that the cost to design and install a new superheater for Langboard would be $850,000, and it agreed to do so. (*Id.* at ¶ 21.) Plaintiff did not immediately provide defendant with notice of Langboard's request to replace the superheater. (*Id.* at ¶ 22.)

On August 17, 2006, plaintiff first notified defendant of Langboard's claim for a new superheater (the "August 2006 Notice"), in conjunction with Hunt's filing of a suit on June 16, 2006, against plaintiff in the Superior Court of Cobb County, Georgia, (the "Hunt Suit") for $64,107.85 allegedly owed on its contract with plaintiff. (*Id.* at ¶ 23.) The August 2006 Notice was provided to defendant by JBL & K Risk Services (now known and hereinafter referred to as "Beecher Carlson"), who was plaintiff's insurance agent with whom plaintiff had a relationship for 10–15 years. (*Id.* at ¶ 27.) Plaintiff looked to Beecher Carlson to deal with notifying insurance companies about possible claims and obtaining coverage for such claims. (*Id.* at ¶ 28.) The August 2006 Notice was faxed by Beecher Carlson to "AIG" in San Ramon, California. (*Id.* at ¶ 25.) The CGL

---

**3.** In a letter to plaintiff dated February 8, 2006, Hunt wrote, among other things: "All work we do will be under the direction of Wellons." (Def.'s Ex. N.) In addition, Ken Kinsley ("Kinsley"), a vice president of plaintiff, testified:

> A: Yes. First, the clearance issue was fixed.
> Q: And was that fixed by Hunt?
> A: I can't say. We used Hunt as a labor service, but I believe—it is my recollection, that Wellons' personnel did the clearance fixing.
> Q: Okay. Isn't it true that Wellons' personnel were also involved in the welding process with Hunt?
> A: Well, you have to understand that these are specialty welds that require specialized certification by ASME, and so our personnel could monitor the work but they couldn't dictate how it was done. How it was done is a function of the quality control program and the credentials that ASME had approved for Hunt as part of their qualification package, so we could only monitor. We couldn't direct that repair work.
> Q: I understand you couldn't tell the people at Hunt how to physically do a weld. Correct?
> A: Correct.
> Q: But weren't Wellons people on-site to tell them what they needed to weld?
> A: Yes.

(Dep. of Kinsley 14–15.)

Policy required notice to be provided to defendant in Boston, Massachusetts. (Def.'s Ex. B 4, 24.) The claim subsequently was forwarded to defendant. (Def.'s Facts ¶ 26.)

The date of loss/claim is listed on the August 2006 Notice as February 10, 2006, and the claimant is noted to be "Hunt/Langboard." The occurrence was described as: "Claimant construction defect. Please contact insured for add'l information." (*Id.* at ¶ 29.) This notice of claim references only the CGL Policy number, not that of the Umbrella Policy. (*Id.* at ¶ 30.) Defendant assigned claim number 683–112912 to this claim.

On March 2, 2007, defendant informed plaintiff through its independent counsel, Foltz Martin LLC ("Foltz Martin"), who had been retained by plaintiff in August 2006 to defend the Hunt Suit and advise plaintiff with respect to insurance coverage issues, that the August 2006 Notice had two claims embedded within it: 1) the Hunt Suit for nonpayment of work performed, as to which defendant denied coverage on March 2, 2007; and 2) Langboard's claim for the replacement of the superheater, which defendant was referring to coverage counsel and would be issuing a reservation of rights letter. (*Id.* at ¶ 33.)

On March 5, 2007, defendant issued a preliminary reservation of rights letter to plaintiff (the letter is misdated "March 5, 2006"), which stated that the claimant was Langboard and the loss date was March 17, 2006. (*Id.* at ¶ 34.) The letter indicated that the claim involved "the failure of a Superheater at the claimant's Georgia facility while undergoing repairs which were contracted to [plaintiff]." (*Id.* at ¶ 35.) In the letter, defendant advised plaintiff that "there may be a coverage question and we are investigating this matter under a reservation of rights." (*Id.* at ¶ 36.) Defendant referred plaintiff to the insuring agreement, which requires "bodily injury" or "property damage" that is caused by an "occurrence," and additionally identified the exclusions for "Damage to Property," "Damage to Your Product," and "Damage to Your Work" (Exclusions j, k and l). (*Id.* at ¶ 37.) Defendant also notified plaintiff that its assuming the responsibility to replace the superheater without defendant's consent might be in violation of the policy contract. (*Id.* at ¶ 38.) Defendant specifically informed plaintiff that "there may be additional policy conditions that may preclude coverage and [the letter] should not be construed as a waiver of other terms and conditions that may apply." (*Id.* at ¶ 39.)

On April 25, 2007, defendant supplemented its initial reservation of rights to plaintiff in a 21–page letter. (*Id.* at ¶ 40.) Defendant advised plaintiff that it currently had no obligation to defend or indemnify plaintiff in connection with Langboard's claim. (*Id.* at ¶ 41.) Specifically, with respect to its duty to defend, "no lawsuit ha[d] been commenced against Wellons and, thus, Lexington ha[d] no obligation to provide a defense to Wellons." (*Id.* at ¶ 42.) The letter further indicated that "it [was] unclear exactly what Langboard's claims of injury are, beyond the demand that the Superheater be replaced." However, "[a]ccording to [Wellons' counsel], the current claim being pursued against Lexington does not relate to the Hunt lien foreclosure claim but, rather, to the [claim] for replacement of the Superheater," which allegedly arose out of defective work performed by Hunt and the alleged consequential property damage that was caused by it. (*Id.* at ¶ 43.) Defendant referred plaintiff to the CGL Policy's provisions, including one that requires "bodily injury" or "property damage" caused by an "occurrence" and pointed out, among other things, that the "Damage to Property," "Damage to Your Product," "Damage to

Your Work" exclusions might limit, in whole or in part, any duty to indemnify. (*Id.* at ¶ 44.)

The supplemental reservation of rights letter also raised two new potential coverage defenses: the "Expected or Intended Injury" exclusion and the "Exclusion for Failure to Supply" (Exclusions a, j, k, l and Endorsement 3). (*Id.* at ¶ 45.) The letter concluded that "without specifics as to what Langboard is claiming as to the cause, how Wellons is responsible (negligent), and what the exact damage is, [defendant] cannot more specifically address coverage" but invited plaintiff to provide any additional relevant information. (*Id.* at ¶ 46.) In the letter, defendant expressly continued "to reserve all rights in connection with this claim and [pointed out that] the failure to set forth any policy provision that may be applicable is not intended to constitute a waiver of any of Lexington's right to rely on any applicable policy provisions of law." (*Id.* at ¶ 47.)

On May 2, 2007, Langboard emailed the following letter to plaintiff:

> By way of this letter, Langboard is requesting Wellons to put a hold on the production of the superheater. We do not believe that at this time there is enough available heat from the two Wellon heat sources to run the O.S.B. plant and generate steam to run the turbine. Langboard is looking into the possibility of going to a powder resin system that will allow us to run a higher moisture from the dryers which would lighten the load on the Wellons units. If this does not give us more available heat we may decide to move the turbine generator to a more suitable location.

(Def.'s Ex. V.)

On July 13, 2007, Foltz Martin sent a response letter to defendant's claims adjuster, David Farrell ("Farrell"), providing the basis for plaintiff's disagreement with defendant's coverage position. (Def.'s Facts ¶ 48.) The eight-page letter set forth plaintiff's position that, although "the initial leaks [in the superheater] were arguably caused by a defect in the design (inadequate spacing between the headers and the support structure of the Superheater)," it was "Hunt's faulty repair of the connection between the tubes and the header [that] caused structural damage to the remainder of the Superheater, and this is the property damage which Langboard claims." (*Id.* at ¶ 49.) Plaintiff demanded that defendant indemnify it for the costs to replace the superheater on or before July 28, 2007, and advised that if defendant failed to do so, plaintiff would "construe Lexington's continued failure to intervene on its behalf as a denial of coverage and breach of its duty to indemnify it under the policy." (*Id.* at ¶ 50.) Foltz Martin's response letter did not mention Langboard's concern that the capacity of the DETOX systems was at issue and its request that plaintiff stop production of the new superheater. (*Id.* at ¶ 51.)

On October 25, 2007, plaintiff and Hunt entered into a Settlement and Release Agreement in the Hunt Suit that provided for a Consent Order containing an admission that "Hunt Construction was negligent in its performance of the obligations under its Contract with Wellons, that the work Wellons contracted with Hunt Construction to perform was performed negligently, and that as a result the Superheater has been irreparably damaged." (*Id.* at ¶ 54.) No money changed hands as part of the settlement. (*Id.* at ¶ 55.)

On October 31, 2007, Langboard filed suit against plaintiff in the Superior Court of Brooks County, Georgia, Case No. 07–CV–472 ("Langboard II"). (*Id.* at ¶ 56.) The complaint alleged generally that the DETOX systems designed and installed by plaintiff never worked as expected. Specifically, the systems were never able to meet the emissions requirements or pro-

duce enough heat to simultaneously run the co-generator. Further, Langboard contended that plaintiff's improper installation of the superheaters caused leaks to develop and that plaintiff's attempts to repair the leaks were "inadequate." Langboard sought as damages the repair or replacement of the DETOX systems. (*Id.* at ¶ 57.)

One week later, plaintiff, through Beecher Carlson, notified defendant of Langboard II by emailing a copy of the summons and complaint directly to the claims adjuster previously assigned to Langboard's claim for a new superheater. (*Id.* at ¶ 58.) On November 27, 2007, Beecher Carlson contacted Farrell to inquire as to "the status of amended complaint and [the] name of the law firm assigned to handle [it]." (*Id.* at ¶ 59.) On November 28, 2007, Farrell responded to Susan Towne ("Towne"), a Beecher Carlson employee, by email stating: "Initially it appeared there was no coverage but upon reviewing again there is some question that we may have some limited coverage. I have asked coverage counsel who was involved in the other related suits to take a quick look to see if he concurs with our thoughts." (*Id.* at ¶ 60.)

On November 29, 2007, Farrell spoke with Towne to notify her that defendant would provide a defense for Langboard II under a reservation of rights.[4] Farrell

testified: "I talked to Susan Towne that our prior letters were in the same mode that the issues addressed in each of the letters are still applicable .... [and that the] prior reservations are still applicable."[5] (*Id.* at ¶ 62.) Towne testified that she did not recall the details of the call (other than that defendant would provide a defense under a reservation of rights), including whether a particular policy was identified, whether the adjuster specified particular coverage defenses, or the specific basis for defendant's reservation of rights. (Dep. of Towne 34, 38.) Farrell testified that he did not recall identifying a particular policy and that he "probably" did not tell Towne on which specific provisions defendant was relying. (Dep. of Farrell 60, 63.)

Subsequently, defendant retained Hall Booth Smith & Slover, P.C. ("Hall Booth"), which was already defending plaintiff in the related Langboard I suit, to represent plaintiff with respect to Langboard II. (Def.'s Facts ¶ 65.) Foltz Martin made an appearance in Langboard II as plaintiff's co-counsel of record along with Hall Booth. (*Id.* at ¶ 66.) Hall Booth and Foltz Martin jointly defended the lawsuit at trial.

On February 25, 2009, Brad Miller ("Miller") of Beecher Carlson sent a letter to Farrell inquiring as to whether the CGL and Umbrella Policies would be available to satisfy the claims in Langboard II.[6]

---

**4.** Towne testified: "This is a phone call that David and I—he told me he was going to provide a defense under an ROR. That just tells me that he is going to be sending a letter, assuming, to the client. Wouldn't do any good to send it to us. We are not the insured so that is what I would expect the next step to be." (Dep. of Towne 34.) In an email to Brad Miller dated November 29, 2007, Towne stated: "David [Farrell] agreed to provide a defense on a ROR." (Def.'s Ex. BB.) In addition, Beecher Carlson's business records noted "TCT David/adj has agreed to provide defense under and [sic] ROR. Will use same attorney and same claim. Will forward to the atty to prepare an answer." (Def.'s Ex. AA 9.)

**5.** More specifically, Farrell testified as follows:

> Q: Did you tell [Towne] four letters were still applicable?
> A: I don't believe I would have mentioned the specific letters, the dates or how many, just prior reservations are still applicable.

(Dep. of Farrell 77.)

**6.** More specifically, the letter stated in part:

> In reviewing some of the correspondence, I noticed that Lexington references Wellons' CGL policy for the policy period September 1, 2004 through September 1, 2005 for both

(Def.'s Ex. DD) According to an email dated March 20, 2009, sent to A. Bryan Baer ("Baer") of Foltz Martin, Miller stated that he "got a voicemail just today from David [Farrell] advising a letter is coming but that their position is still one occurrence for the falling over of the bundles and the other items are not considered a covered occurrence." (Def.'s Ex. CC 4.) In an email dated March 23, 2009, sent to Miller, Kevin Hudson of Foltz Martin observed that defendant is "argu[ing that] it is excused from both cases because it contends both cases arise from 1 occurrence." In an email dated June 26, 2009, from Baer to Farrell, and a letter dated July 1, 2009, from Baer to Farrell, Baer pointed out, among other things, that Farrell had not responded to the question posed in the February 25, 2009 letter from Miller. (Dep. of Farrell 125–129, Ex. 38, 39.) Farrell testified that he did not remember whether he responded to any of the above referenced correspondences.[7] (*Id.*)

On March 12, 2010, defendant emailed a letter to plaintiff's coverage counsel denying coverage for the Langboard II claims under the CGL Policy. The letter asserted that discovery in Langboard II failed to produce any evidence of any "occurrence" or related damage and that "discovery show[ed] that the [DETOX boiler units] never operated as expected and the only damages [we]re for less production of OSB than expected as well as a lack of energy for co-generation purposes." (Def.'s Facts ¶ 69.)

Defendant's reservation of rights letters dated September 30, 2005 (addressing the tube bundle collapse at issue in Langboard I) and March 5, 2007 (addressing Langboard's claim for a new superheater) were specifically referenced, and defendant referred to the fact that certain exclusions were contained in the reservation of rights letters that may otherwise be applicable if there were an "occurrence" or "property damage." (*Id.* at ¶ 70.) Despite its denial of coverage, defendant continued the defense of plaintiff in the Langboard II trial, as they had previously agreed. (*Id.* at ¶ 71.)

On the same day, defendant referred the Langboard II claims to its excess claim unit. Defendant first asserted its coverage position under the Umbrella Policy, denying coverage, on April 22, 2010, after entry of the judgment in Langboard II.

The trial in Langboard II commenced on March 15, 2010, and a jury awarded Langboard $8,440,764, consisting of $3,425,000 for breach of the Purchase Agreement and $5,015,764 for breach of the Construction Agreement. (*Id.* at ¶ 72.) Judgment was entered on the verdict on

suits [Langboard I and II] and wanted to confirm that Wellons' CGL and Excess policies for the policy period September 1, 2005 through September 1, 2006 were also available for coverage. In addition, Wellons CGL and Excess policies for policy periods September 1, 2003 through September 1, 2004 may apply to the second suit as well.
(Def.'s Ex. DD.)

7. Farrell testified, among other things:
Q: Did you have the intention in August of 2009 to respond to the July 1, 2009 letter?
A: I had the intention, it was being conveyed verbally on several occasions, and would have been nice to reduce it to writing, hindsight, yes. But I am thinking we had the exchange of that information verbally several times. It was coverage counsel that I was conveying it to, coverage for Wellons.
Q: When you wrote in your entry here in the file notes, "I will respond shortly." Were you referring to responding in writing or orally?
A: I don't recall specifically.
Q: Do you know whether in writing or orally you ever responded after the July 1, 2009 letter?
A: I don't recall.
(Dep. of Farrell 131.)

March 31, 2010. (*Id.* at ¶ 73.) Plaintiff appealed the verdict to the Georgia Court of Appeals. (Pl.'s Facts 54.)

On June 11, 2010, plaintiff filed this action for declaratory judgment. Plaintiff requests a declaration that defendant is required to indemnify plaintiff for the jury verdict entered in Langboard II (Count I). Specifically, plaintiff contends that defendant assumed and conducted the defense of Langboard II without effectively reserving its rights and therefore is estopped from asserting any defenses of noncoverage. In addition, plaintiff requests a declaration that defendant is required to appeal the verdict in the Langboard II (Count II) and that defendant is required to pay for plaintiff's independent counsel as part of its obligation to provide a defense (Count III). Defendant denies it has waived its coverage defenses and has asserted a counterclaim for declaratory judgment, requesting a declaration that it owes no coverage to plaintiff for the jury verdict in Langboard II on the basis that the facts giving rise thereto are not covered under either the CGL Policy (Count I) or the Umbrella Policy (Count II).

## II. Legal Analysis

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). Only those claims for which there is no need for a factual determination and for which there is a clear legal basis are properly disposed of through summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

It is well settled that a court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant. *See, e.g., Samples v.*

*City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988); *Tippens v. Celotex Corp.,* 805 F.2d 949, 953 (11th Cir.1986), *reh'g denied,* 815 F.2d 66 (11th Cir.1987). To survive a motion for summary judgment, the non-moving party need only present evidence from which the trier of fact might return a verdict in his favor. *Samples,* 846 F.2d at 1330. However, Rule 56, "[b]y its very terms, ... provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The materiality of facts is governed by the relevant substantive law in the case. *Id.* at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that the factual issues "may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

Consideration of a summary judgment motion does not lessen the burden on the non-moving party. The non-moving party still bears the burden of coming forth with sufficient evidence. *See Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). "If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted." *Herzog v. Castle Rock Entm't,* 193 F.3d 1241, 1247 (11th Cir. 1999) (citation omitted).

Both parties have moved for summary judgment as to defendant's duty to provide a continued defense and indemnification for jury verdict in Langboard II. Plaintiff argues that because defendant provided a defense in Langboard II without a reservation of rights, it is estopped from denying continued defense, coverage, and in-

demnification for the verdict in Langboard II under both the CGL Policy and the Umbrella Policy. Defendant argues that it did not waive its rights because it adequately reserved its rights under the CGL Policy and was not required to reserve its rights under the Umbrella Policy at the time Langboard II was tendered as the CGL Policy limits had not been exhausted. Defendant further argues that there is no coverage under the Umbrella Policy because plaintiff never provided sufficient notice of a claim under the Umbrella Policy.

## A. The CGL Policy.

■ Georgia courts have long recognized "that risks not covered by the terms of an insurance policy, or risks excluded therefrom, while normally not subject to the doctrine of waiver and estoppel, may be subject to the doctrine where the insurer, without reserving its rights, assumes the defense of an action or continues such defense with knowledge, actual or constructive, of noncoverage."[8] *World Harvest Church, Inc. v. GuideOne Mutual Ins. Co.*, 287 Ga. 149, 151, 695 S.E.2d 6 (2010) (citations omitted). "The insurer can avoid estoppel by giving timely notice of its reservation of rights which fairly informs the insured of the insurer's position." *Id.* at 152, 695 S.E.2d 6. "The consent of the insured to the nonwaiver notice either may be express or implied [from] the insured's tacit acquiescence in the insurer's unilateral reservation of rights; e.g., where the insured, after receiving such notice, permits the insurer to

continue defense of the suit." *State Farm Mut. Auto. Ins. Co. v. Anderson*, 104 Ga. App. 815, 818, 123 S.E.2d 191 (1961).

■ To avoid estoppel, although a reservation of rights is not required to be in writing, "[a]t a minimum, [it] must fairly inform the insured that, notwithstanding the insurer's defense of the action, it disclaims liability and does not waive the defenses available to it against the insured." *World Harvest Church, Inc.*, 287 Ga. at 152, 695 S.E.2d 6 (internal quotation and citations omitted). With regard to what constitutes adequate notice of a reservation of rights, the Georgia Supreme Court in *World Harvest Church, Inc.* further held: "That notice cannot be only a statement of future intent.... Furthermore, a mere allegation that the insurer contended that [the insured] was not covered by the policy, without more, [does] not show any reservation on its part of a right to insist that the coverage of the policy was not extended to him.... The reservation of rights should also inform the insured of the specific basis for [the insurer's] reservations about coverage." *Id.* (internal quotations and citations omitted).

■ Here, the court finds that defendant gave timely and adequate notice of its reservation of rights under the CGL Policy. It is not disputed that following its receipt of the summons and complaint in Langboard II from Beecher Carlson, plaintiff's insurance agent,[9] defendant noti-

---

8. Both parties agree that Georgia law applies to the insurance coverage dispute.

9. Under Georgia law, "[i]ndependent insurance agents or brokers" like Beecher Carlson "are generally considered the agent of the insured." *Kay-Lex Co. v. Essex Ins. Co.*, 286 Ga.App. 484, 489, 649 S.E.2d 602 (2007). According to general agency principles, "[n]otice to the agent of any matter connected with his agency shall be notice to the principal." O.C.G.A. § 10-6-58; *Witcher v. JSD Proper-*

*ties, LLC*, 286 Ga. 717, 719, 690 S.E.2d 855 (2010). Here, the undisputed record shows that plaintiff used its agent Beecher Carlson to notify defendant about the filing of Langboard II. In response, defendant notified Beecher Carlson regarding its defense in Langboard II. There is no evidence that plaintiff was not notified through its agent. In addition, at the hearing held on March 7, 2013, plaintiff's counsel admitted that Beecher Carlson was plaintiff's agent.

fied Beecher Carlson that "it initially appeared there was no coverage but upon reviewing again there is some question that we may have some limited coverage." (Def.'s Facts ¶¶ 58–60.) Towne, a Beecher Carlson employee, testified that Farrell, defendant's claims adjuster, had told her that "he was going to provide a defense under an ROR [i.e., reservation of rights]." (Dep. of Towne 34.) Farrell testified that he informed Towne that "the prior letters were in the same mode [and] that the issues addressed in each of the letters [were] still applicable." (Dep. of Farrell 77.) The fact that defendant provided plaintiff, through its agent, with actual and unambiguous notice that its provision of a defense was subject to a reservation of rights is confirmed by Beecher Carlson's contemporaneous internal records and communications. In an email to Miller dated November 29, 2007, Towne stated: "David [Farrell] agreed to provide a de-

fense on a ROR." (Def.'s Ex. BB.) In addition, Beecher Carlson's business records noted "TCT David/adj has agreed to provide defense under and [sic] ROR. Will use same attorney and same claim. Will forward to the atty to prepare an answer." (Def.'s Ex. AA 9.)

Unlike in *World Harvest Church, Inc.*, 287 Ga. at 152, 695 S.E.2d 6, where a claims adjuster for defendant insurer merely stated that it did not see coverage but would have to see if there would be coverage issues, here the claims adjuster, Farrell, specifically informed plaintiff that defendant would provide a defense under a reservation of rights. As the Georgia Supreme Court held, "[the] actual notice of a reservation of rights is [not] ineffective [because it is] without a confirming letter." *Id.* The undisputed facts show that plaintiff understood that defendant would defend Langboard II subject to a reservation of rights.[10]

10. Ken Kinsley testified as corporate representative of plaintiff:

Q: I think we sometimes refer to Langboard One as the collapse case and Langboard Two as the capacity case?
A: Yes.
Q: What is the company's position with regard to the reservation of rights by Lexington with regard to those claims?
A: Well, we received on Langboard One a reservations of rights claim after we submitted to our insurance broker a claim, the notice of claim from Langboard, and we received a reservations of rights letter after we told our insurance company that there might be a claim associated with the superheater of the boiler at Langboard, although, that was before any formal claim from Langboard was presented.
Q: Any other reservation of rights from Lexington?
A: Not that come to mind.
Q: Is it your understanding that no reservation of rights came from Lexington after Langboard Two was filed?
A: That is my understanding, yes.
Q: Okay. Have you ever discussed the issue of Lexington's reservation of rights on Langboard Two with anyone from Beecher Carlson?

A: No.
Q: Have you had any discussions at all with regard to the Langboard matter with anyone at Beecher Carlson?
A: Probably early in the processing of the claim. I believe I would have talked with our contact there, Craig Payne, to let him know that things were coming, but once we turned that type of thing over to our insurance company, unless they contact me, I would have no direct interface with them.
Q: And when you say "our insurance company," you mean Beecher Carlson?
A: Yes.
Q: I think what you told me was you are aware that when the claim with regard to the superheater was submitted by your insurance company, Beecher Carlson, that Lexington sent a written reservation of rights letter?
A: Yes.
Q: And do you know how many there were? Were there more than one?
A: I—no. I believe there was more than one, but I don't know if there was more than two.
Q: Okay.

In addition, Farrell's reference to previous reservation of rights letters, which identified the coverage exclusions that might apply, satisfied the requirement that the notice contain specific bases for the reservation of coverage.[11] More specifically, following its receipt of the August 2006 Notice, defendant issued a preliminary reservation of rights letter to plaintiff on March 5, 2007, in which it indicated the claimant was Langboard and the loss date was March 17, 2006. The letter informed plaintiff that "there may be a coverage question and we are investigating this matter under a reservation of rights." (Def.'s Facts ¶ 36.) Defendant specifically referred plaintiff to the exclusions that might bar coverage and noted that due to the continuing investigation, there may be additional policy conditions that precluded coverage and that "[the letter] should not be construed as a waiver of other terms and conditions that may apply." (*Id.* at ¶ 39.)

Defendant then supplemented its reservation of rights on April 25, 2007, in a 21–page letter in which it not only reasserted the policy provisions it previously identified but also identified additional ones that might limit or bar coverage: Expected or Intended Injury and the Exclusion for Failure to Supply at Endorsement 3. The April 2007 letter indicated that although defendant "ha[d] no current obligation to provide a defense to [plaintiff] in connection with the claim asserted by Langboard" (as no suit had been filed), "certain of the exclusions contained in the Lexington policy [may] limit or bar coverage for this claim." (*Id.* at ¶ 42.) It was specifically noted at that time that "it [was] unclear exactly what Langboard's claims of injury are, beyond the demand that the Superheater be replaced[,]" and that

---

A: You know, I get sent a lot of paperwork in my position, which I then forward to the proper place.

(Dep. of Kinsley 10–12.) In sum, Kinsley testified that although he is not aware of receiving a reservations of rights after Langboard II was filed, he would not have necessarily received such a notice because "once [plaintiff] turned that type of thing over to [Beecher Carlson] .... [he] would have no direct interface with them." (*Id.*) In this regard, Miller of Beecher Carlson testified:

Q: Okay. And earlier, when we talked about an insurance company issuing a reservation of rights, did you understand this to be that, in other words, that they [i.e., defendant] were saying they will defend Langboard Two but under reservation of rights?

A: Based on what Dave [Farrell] said here, that was what we inferred from it.

(Dep. of Miller 42–43.) "Notice to the agent of any matter connected with his agency shall be notice to the principal." O.C.G.A. § 10–6–58.

11. Defendant admits that it did not send a formal written reservation of rights letter following its receipt of Langboard II. (Resp. to

Pl.'s Facts ¶ 25.) In this regard, Farrell testified:

Q: When the lawsuit ... in Langboard II ... came in, you had more definition now as to what Langboard was claiming. You had specifics as to allegations and legal claims?

A: They [were] more defined than Langboard I, but they were still very vague.

Q: But you had certainly more specifics than you had as of April 2007?

A: Yes. I had more specific allegations.

Q: Based on the fact that you now had more specific allegations, didn't you think it made sense to issue a new reservation of rights letter?

A: At first I did and I looked at what coverage counsel looked at and we were coming up with the same—I shouldn't say we. Coverage counsel came up with pretty much the same or exact same exclusions. It was like we have issued letter a couple of times already and do we really need to do it since it was being done in conjunction with talks back and forth with Wellons' coverage counsel. We felt that everyone heard and understood all the issues and at that point nothing was changing.

(Dep. of Farrell 86–87.)

"without specifics as to what Langboard is claiming as to the cause, how Wellons is responsible (negligent), and what the exact damage is, [defendant could] not more specifically address coverage." (*Id.* at ¶ 43.) Defendant expressly continued "to reserve all rights in connection with this claim and [pointed out that] the failure to set forth any policy provision that may be applicable is not intended to constitute a waiver of any of Lexington's right to rely on any applicable policy provisions of law." (*Id.* at ¶ 47.)

The court finds that the March and April 2007 reservation of rights letters are unambiguous. They clearly "inform [plaintiff] that .... [defendant] does not waive the defenses available to it against the insured." *World Harvest Church, Inc.*, 287 Ga. at 152, 695 S.E.2d 6. They also provide specific bases for a reservation of rights. In fact, as defendant points out, the letters referred plaintiff to the policy provisions which may limit or bar coverage under the CGL Policy and the bases on which coverage was ultimately denied for Langboard II. Farrell's oral reservation of rights followed these two reservation of rights letters, which he referenced, and a months-long dialogue among plaintiff, its counsel, and its insur-

ance agent regarding defendant's coverage position as to Langboard's claim for a new superheater.[12] Plaintiff was on notice of defendant's coverage position at the outset of Langboard II.

Plaintiff argues that defendant's March and April 2007 reservation of rights letters related to a separate claim, not the claim in Langboard II. More specifically, plaintiff alleges that the letters addressed the claim involving the superheater (the "superheater claim") whereas the claim in Langboard II involved the capacity of the DETOX systems (the "capacity claim"). The superheater is a component of the boiler within the DETOX systems, a small subset of the entire system. The superheater is the last section of the boiler where steam passes before being sent to the turbine. Plaintiff contends that the superheater is not the basis for the capacity claim in which Langboard claims that the system as a whole lacks the capacity to produce electricity. Plaintiff contends that the superheater claim involved a discrete problem with the superheater that began in February 2006 when some of the superheater tubes experienced leaks at the welds. Plaintiff further contends that it was Langboard's claim for replacement of the superheater that was submitted to de-

---

12. For example, in an email dated April 27, 2007, sent to Kinsley, Baer stated: "As mentioned in my voicemail yesterday, we do not believe AIG's current coverage position should materially alter our strategy. In fact, if we can negotiate a confession of judgment with Hunt, then that will effectively cut off many of AIG's arguments for denying coverage." (Def.'s Ex. X.) In this regard, Baer testified:

Q: Do you recall sending this e-mail to Ken Kinsley on or about 4–27–07?

A: No, but this e-mail refreshes my recollection that it says what it says.

Q: But does it refresh your recollection that the part of the strategy with Hunt was to use it to some advantage with the Lexington coverage issue?

A: Yes, we—not necessarily a strategy, but Hunt confessing to doing what it did, which was negligently repair the superheater, culminating in the irreparability of the entire superheater, would be facts that we believe put this under, under AIG's coverage.

(Dep. of Baer 71–72.) In addition, in response to the April 25, 2007, reservation of rights letter, plaintiff's counsel demanded that if defendant did not agree to indemnity it for the costs of replacing the superheater by July 28, 2007, plaintiff would construe such conduct "as a denial of coverage and breach of its duty to indemnify it under the policy." (Def.'s Facts ¶ 50.) Defendant did not so agree.

fendant as the superheater claim; and it is this claim, not the capacity claim, which is addressed in defendant's reservation of rights letters.

The facts indicate, however, that Langboard's initial claim for a new superheater evolved into an assertion that the system itself was insufficient long before Langboard II was filed. The April 2007 reservation of rights letter specifically noted that "it [was] unclear exactly what Langboard's claims of injury are, beyond the demand that the superheater be replaced." Defendant further informed plaintiff that "without specifics as to what Langboard is claiming as to the cause, how Wellons is responsible (negligent), and what the exact damage is, we cannot more specifically address coverage." Plaintiff, through its coverage counsel Foltz Martin, responded in turn. Foltz Martin represented plaintiff continuously from before the time the August 2006 Notice was submitted to defendant, and plaintiff relied on Foltz Martin to advise it with regard to any insurance coverage issues. (Dep. of Nye 31.)

It was during the course of defendant's ongoing conversations with plaintiff and its attorneys regarding coverage that Langboard first asserted its capacity claim. In an email dated May 2, 2007, Langboard first requested that plaintiff "put a hold on the production of the superheater." (Def.'s Ex. V.) Langboard then informed plaintiff that it did "not believe that at this time there is enough available heat from the two Wellon heat sources to run the O.S.B. plant and generate steam to run the turbine." (Id.) The record shows that plaintiff was aware of Langboard's allegations with respect to the system's capacity six months prior to this email. (Dep. of Nye 40.) Moreover, defendant's claims adjuster also was aware of the capacity claim prior to Langboard II being filed, and when investigating the August 2006 Notice regarding a "construction defect," his inquiry was not limited to "focusing

strictly on the superheater, but the ongoing claim that . . . production and cogeneration were not reaching—had never reached the levels they should have." (Dep. of Farrell 74, 116.) It is undisputed that both parties were aware of the capacity claim prior to filing of Langboard II on October 31, 2007.

In addition, the factual allegations in the Langboard II complaint address both the collapse claim and the issues with respect to the superheater—matters which had been extensively discussed previously by the parties and as to which defendant had expressly reserved its rights. (Def.'s Ex. D.) The complaint in Langboard II generally alleged that the DETOX systems designed and installed by plaintiff never worked as expected. Specifically, the complaint alleged that the systems were never able to meet the emissions requirements or produce enough heat to simultaneously run the co-generator. Further, Langboard contended that plaintiff's improper installation of the superheaters caused leaks to develop and that plaintiff's attempts to repair the leaks were "inadequate." Langboard sought as damages the repair or replacement of the DETOX systems. (Def.'s Facts ¶ 57.) By the time defendant orally reserved its rights following the filing of the complaint in Langboard II, plaintiff was aware of defendant's coverage position.

Plaintiff then argues that defendant's March and April 2007 reservation of rights letters did not raise the coverage defenses upon which defendant now relies. Defendant denied coverage for Langboard II for two reasons: the absence of either an "occurrence" or "property damage" under the terms of the CGL Policy. In both the March and April 2007 reservation of rights letters, the insuring agreement requiring "bodily injury" or "property damage" caused by an "occurrence" is specifically referenced,[13] and defendant expressly reserved the right to rely on additional cov-

---

13. Farrell testified:

Q: To summarize, prior to the receipt of Langboard II, the four reservation of rights

erage provisions. The court finds defendant's reservation of rights sufficiently set forth its basis.

Although the Georgia Supreme Court held that "[t]he reservation of rights should also inform the insured of the specific basis for [the insurer's] reservations about coverage," it did not define the parameters of specificity. *World Harvest Church, Inc.*, 287 Ga. at 152, 695 S.E.2d 6. This court also notes that the Georgia Supreme Court did not use the mandatory language requiring that the "specific basis" be included in the reservations. In addition, a review of the case law reveals that Georgia courts have held that a general reservation of rights is sufficient to provide the insured with notice of the conditions placed on the defense. *See Anderson*, 104 Ga.App. at 819, 123 S.E.2d 191 (letter to insured that generally reserved rights to deny coverage despite provision of a defense was effective and "was broad enough to cover a denial of liability on the ground the policy was void."); *State Farm Fire and Cas. Co. v. Walnut Avenue Partners, LLC*, 296 Ga. App. 648, 654, 675 S.E.2d 534 (2009) (res-

ervation of rights form providing that the defense of any claim "shall not waive any right [the insurer] may have to deny any obligation under the policy contract, and shall not waive any rights of [the insurer]" was effective.); *Jacore Systems, Inc. v. Central Mut. Ins. Co.*, 194 Ga.App. 512, 513–14, 390 S.E.2d 876 (1990) (holding that insurer's reservation of rights letter was sufficient where it "explained ... that the reservation of rights was being made 'because of the definition of contract under [insured's] policy' and its exclusion of certain product warranty claims."); *Continental Ins. Co. v. Weekes*, 140 Ga.App. 791, 792–93, 232 S.E.2d 80 (1976) (letter stating insurer's intention to enter a defense for the insured "but with a reservation of rights," and that the insurer was not thereby conceding liability or coverage under the policy, was "sufficient to protect and preserve its claim of non-coverage."). Plaintiff has not cited any binding law to support its contention that defendant is required to list each and every basis for contesting coverage.[14] *Cf. North Metro Directories Pub., LLC v. Cotton States*

---

letters that had been sent [from] Lexington to Wellons, none of them specifically reference lack of occurrence or lack of property damage?

A: Correct.

Q: When you received Langboard II, did you see as a potential coverage issue lack of occurrence and lack of property damage?

A: Yes.

Q: At that point in time, why didn't you send a reservation of rights letter raising those issues to Wellons?

A: At that point in my mind, Wellons has coverage counsel involved quite a bit, obviously educated, and we had pointed out that for coverage to be applicable it has to have an occurrence and properly defined. And that was adequately telling everyone, reminding everyone that is a condition.

(Dep. of Farrell 113.)

14. Plaintiff's citation to cases holding that once an insurer makes an entry of appearance for the insured, it is obligated to inform the

insured immediately upon discovering noncoverage is not on point here. Unlike the cases cited by plaintiff, defendant in this case already informed plaintiff of possible noncoverage prior to commencing plaintiff's defense. *See Home Indem. Co. v. Godley*, 122 Ga.App. 356, 361, 177 S.E.2d 105 (1970) (holding: "An entry of an appearance for the insured by the insurer does not of itself constitute a waiver of available defenses, but the insurer is entitled to a reasonable time in which to investigate the facts. And the insurer may withdraw from the defense upon learning of facts which constitute a policy breach, and no waiver or estoppel will arise. But the insurer is required to act seasonably in disclaiming liability and it could not delay its decision so long that the insured's rights were prejudiced thereby."); *Ponse v. Atlanta Cas. Co.*, 254 Ga.App. 641, 642–43, 563 S.E.2d 499 (2002) (holding "[w]hile [the insurer] had a right to investigate whether it had a duty to defend and provide coverage, it was obliged to inform [the insured] immedi-

*Mut. Ins. Co.,* 279 Ga.App. 492, 496, 631 S.E.2d 726 (2006) (holding that "[n]othing ... requires that the insurance company list each and every basis for contesting coverage in the reservation-of-rights letter before the company may raise such in [a] declaratory judgment action.").

Plaintiff also argues that defendant's handling of Langboard II was sloppy and not in compliance with its own policy. According to defendant's informal policy, a reservation of rights letter is supposed to be sent out whenever an examiner recognizes a coverage question for a loss or suit. (Dep. of Pingree 29–30.) In addition, Towne testified that she did not remember whether Farrell told her on the phone that he was going to follow up his oral reservation of rights with a letter, but "[t]hat would be a normal process." (Dep. of Towne 32.) In this regard, Farrell testified that "[i]f it is a single suit that hasn't been addressed before and there is a reservation, I would follow-up [with a written letter but i]n a case where there is [sic.] ongoing situations that appear to all be the same overall thing, I may or may not." (Dep. of Farrell 67.)

Furthermore, the issue here is not whether defendant's claims adjuster followed his normal course when reserving rights following the tender of Langboard II or whether defendant's subsequent handling of the suit was sloppy, as plaintiff alleges. Georgia law does not require the recitation of magic words. Rather, as recently articulated by the Georgia Supreme Court in *World Harvest,* to be effective, a reservation of rights must only inform the insured that "notwithstanding [the insurer's] defense of the action, it disclaims

liability and does not waive the defenses available to it against the insured." *World Harvest Church, Inc.,* 287 Ga. at 152, 695 S.E.2d 6. For the reasons set forth above, the court finds that the undisputed facts on the record show that defendant gave timely and adequate notice of its reservation of rights under the CGL Policy. Accordingly, defendant is not estopped from denying coverage under the CGL Policy.

### B. The Umbrella Policy.

Plaintiff argues that defendant is estopped from denying a continued defense, coverage, and indemnification for the verdict in Langboard II under the Umbrella Policy because it provided a defense in Langboard II without a reservation of rights. In opposition, defendant argues that it was not required to reserve its rights under the Umbrella Policy at the time Langboard II was tendered as the CGL Policy limits had not been exhausted and that, as an excess insurer, it had no duty to speak to coverage until the limits of all underlying insurance policies were exhausted. Defendant also argues that there is no coverage under the Umbrella Policy because plaintiff never provided sufficient notice of a claim under the Umbrella Policy and failure to comply with this condition precedent precludes coverage under the Umbrella Policy as a matter of law.

Plaintiff contends that once it became clear that the alleged damages in Langboard II exceeded the CGL Policy limits and triggered the Umbrella policy limits,[15] defendant was required to fairly inform plaintiff of its coverage position under the Umbrella Policy. In support, plaintiff cites the Eleventh Circuit's decision of

---

ately that it intended to deny coverage if it learned of information indicating that no coverage existed under its policy.").

**15.** Plaintiff asserts that not only was defendant aware that the claimed damages in

Langboard II greatly exceeded the limits of its primary policy but also that, starting in February 2009, plaintiff repeatedly requested defendant to confirm its coverage position under the Umbrella Policy.

*American Family Life Assurance Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826 (11th Cir.1989). The court finds that the facts in that case are distinguishable from the ones at hand.

In *American Family*, the insured gave notice to both its primary and excess insurer of a lawsuit filed against the insured. The primary insurer denied coverage for liability but agreed to defend the insured. The excess insurer denied both liability coverage and any obligation to defend. The Eleventh Circuit noted that in the absence of a contractual obligation, the excess insurer was not obligated to provide a defense. *Id.* at 832. The Eleventh Circuit found, however, there was a provision in the policy imposing such an obligation on the excess carrier. *Id.* The policy provided:

> Underlying Insurance. If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

*Id.* at 832 n. 1. The court thus concluded that once the primary carrier denied coverage, the excess carrier was contractually obligated to provide a defense. *Id.* at 832.

Here, the Umbrella Policy does not contain such a contractual provision. The Umbrella Policy does not provide liability coverage until the CGL policy has been exhausted. The Umbrella Policy was not triggered,[16] and defendant had no duty to defend or to speak to coverage.

■ Although the Eleventh Circuit's holding in *American Family* was explicitly based on the terms of a contractual provision,[17] the Eleventh Circuit also noted that the insurer "became obligated to defend once it became clear that [the primary] policy would not cover [the insured's] liability." *Id.* The court finds the statement to be dicta and unsupported by Georgia authority. In making such a statement, the Eleventh Circuit relied solely on a comment in *Couch on Insurance*, which states: "But certain courts have held that the excess carrier must participate in the defense and share in the costs of defense when it is clear that the potential judgment against the insured may be substantially greater than the amount of the primary policy limits." 14 *Couch on Insurance 2d* § 51:36. This statement represents a minority rule. More specifically, *Couch* provides: "As a general rule, a true-excess insurer is not obligated to defend its insured until all primary insurance is exhausted or the primary insurer has tendered its policy limits.[18] .... However, a minority of juris-

---

**16.** Defendant alleges that plaintiff was aware that the Umbrella Policy had not yet been triggered because it had encountered a similar situation when it provided notice of a claim to another excess insurer. With regard to that claim, plaintiff's own independent coverage counsel advised plaintiff in March 2009 that "there is case law suggesting that an insurer waives its right to deny coverage if it defends an action prior to issuing a reservation of rights letter. I imagine that Arch fears Lexington will exhaust its primary coverage at the upcoming mediation which would trigger Arch's duty to defend." (Def.'s Ex. CC 5.)

**17.** The court held: "Because [the excess insurer] was contractually obligated to provide a defense, we conclude that [the excess insurer] is liable for attorney's fees incurred by [the insured] in providing its own defense." *Id.*

**18.** Under the general rule, an excess carrier has no duty to speak as to coverage until the primary layer has been exhausted. *See, e.g., U.S. Fire Ins. Co. v. Vanderbilt Univ.*, 82 F.Supp.2d 788 (M.D.Tenn.2000) (holding that, where insured provided notice to excess carrier of underlying litigation and excess carrier accepted notice under general reservation of rights but refused to defend or in-

dictions have held an excess carrier's duty to defend may be triggered if there is a possibility that excess coverage may be reached." 14 *Couch on Insurance 3d*, § 200:38.

■ The parties have not submitted and the court is not aware of any Georgia cases that have followed this minority rule. The court is not bound by the Eleventh Circuit's interpretation of a secondary source stating a minority rule that is not followed in Georgia. In applying state law, this court "is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690 (11th Cir.1983).

The court concurs with the Southern District of Georgia which specifically held that adopting the minority rule stated in *American Family* "would ... seem to be contrary to Georgia law." *Continental Cas. Co. v. Synalloy Corp.*, 667 F.Supp. 1523, 1540 (S.D.Ga.1983). That court held that, under Georgia law, an excess insurer is not obligated to participate in a defense merely upon notification that a tort claim might invade excess coverage. *See e.g., Motors Ins. Co. v. Auto–Owners Ins. Co.*, 251 Ga.App. 661, 663, 555 S.E.2d 37 (2001) (holding that "[a]s the excess insurer, Auto–Owners Insurance had a duty to defend the claims against its insured after the primary insurer denied coverage and refused to defend."). The Southern District reasoned that adopting the minority

rule would essentially make an excess insurer a coinsurer with the primary insurer. *Id.* "Where the insured purchases one policy specifically as excess coverage, equating the two companies' defense duties as a matter of law would reform the contracts." *Id. Accord St. Paul Fire and Marine Ins. Co. v. Children's Hosp. Nat'l Medical Ctr.*, 670 F.Supp. 393, 402 (D.D.C.1987) (holding that the insurer, who provided both primary and excess coverage and defended the insured, including participating in settlement negotiations involving amounts far exceeding the primary coverage, was not estopped from denying coverage under the excess policies "prior to the time the verdict was rendered.").

The Georgia cases support the express holding in *American Family* that "in the absence of a contractual obligation ... the excess insurance carrier was not obligated to provide a defense." *American Family*, 885 F.2d at 832. Georgia courts have consistently determined the duty of an excess insurer exclusively by the terms of its insurance contract. *See Yeomans & Associates Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 274 Ga.App. 738, 741, 618 S.E.2d 673 (2005) (holding that "[a]n insurance policy is simply a contract, the provisions of which should be construed as any other type of contract" and that "[w]hether an insurer is obligated to defend an action against its insured is determined by the contract."); *Penn–America Ins. Co. v. Disabled American Veterans, Inc.*, 224 Ga. App. 557, 563, 481 S.E.2d 850 (1997) (holding that "the ultimate test for determining

---

demnify insured, excess carrier had no duty to make specific reservation of rights, even when it was notified of underlying litigation). This general rule applies even where an insurer carries both primary and excess coverage. *See, e.g., Phoenix Ins. Co. v. U.S. Fire Ins. Co.*, 189 Cal.App.3d 1511, 1527–28, 235 Cal.Rptr. 185 (1987) (holding that, where insurer's coverage was primary as to some periods and excess as to earlier periods, and insurer had

provided a defense for claims spanning both periods without reserving rights under excess policy, insurer was not estopped from contesting excess coverage because defense was provided under primary policy and no duty to defend under excess coverage had arisen at the time the defense was provided); *St. Paul Fire and Marine Ins. Co. v. Children's Hosp. Nat'l Medical Ctr.*, 670 F.Supp. 393 (D.D.C. 1987).

whether the insurer has a duty to defend is whether the claim asserted actually falls within the coverage of the policy."); *Aetna Cas. & Sur. Co. v. Empire Fire & Marine Ins. Co.,* 212 Ga.App. 642, 644, 442 S.E.2d 778 (1994) (holding that "[t]he true rule is that the duty to defend is determined by the contract.").

In this regard, the Eleventh Circuit's holding in *National Union Fire Ins. Co. of Pittsburgh, Penn. v. Travelers Ins. Co.,* 214 F.3d 1269 (11th Cir.2000), is instructive. The fact that *National Union* involved the application of Florida rather than Georgia law is not significant because under both an insurer's duty to defend is determined by the allegations in the complaint and the defense provisions in the insurance policy. *Id.* at 1272. After considering its policy language, the Eleventh Circuit found that the excess liability insurer's duty to defend was consecutive to, rather than concurrent with, the primary insurer's duty to defend. The Eleventh Circuit held that the excess liability insurer did not have a duty to defend after learning that the insured's liability would exceed the primary policy limit. *Id.* at 1273. Significant to the present dispute is the Eleventh Circuit's determination of the excess insurer's intent where that policy provided:

> The provisions of this section apply solely to occurrences covered under this policy *but not covered by any underlying policies listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.*
>
> This section shall also apply to occurrences *not covered by any underlying*

*insurance* due to exhaustion of any aggregate limits by reason of any losses paid thereunder.

*Id.* at 1272 (emphasis in original). In the Eleventh Circuit's view, "[t]he emphasized language unambiguously manifests [the insurer's] intention that its policy only activate following the complete cessation of coverage under all underlying policies," and thus the excess insurer's "duty to defend was consecutive to, rather than concurrent with, any underlying insurer's duty to defend."[19] *Id.* at 1272–73.

The Umbrella Policy's defense provision contains virtually identical qualifying language:

> The provisions of this section apply to claims covered under this policy, but not covered by any underlying policies listed in the Schedule of Underlying Insurance, whether or not collectible, or any other underlying insurance providing coverage to the Insured, whether collectible or not.
>
> This section shall also apply to claims resulting from occurrences not covered by underlying insurance, due to exhaustion of any aggregate limits by reason of losses paid thereunder.

(Def.'s Ex. C 1.) Given the Eleventh Circuit's construction of this limiting language, the court must conclude that the intention of defendant was the same as that of the excess insurer in *National Union, i.e.,* that its policy would not be triggered until the complete cessation of all coverage under the CGL policy and that its duty to defend remained consecutive.

Accordingly, defendant did not have a duty to defend under the Umbrella Policy

---

19. The Eleventh Circuit in *National Union* expressly noted that the holding in *American Family* "support[s] our holding that the duty of an excess insurer is determined exclusively by the terms of its insurance contract." *National Union,* 214 F.3d at 1274 n. 8. The Eleventh Circuit then distinguished its holding in *American Family* on the ground that "there was a provision in the insurance contract imposing [the duty to defend] on [the excess insurer]." *Id.*

until the CGL Policy limits had been exhausted. The defense of Langboard II was provided by defendant in its capacity as primary insurer under the CGL Policy.[20] Thus, defendant, as excess insurer, is not estopped from denying coverage under the Umbrella Policy despite its provision of a defense under the CGL Policy.

### III. Conclusion

For all the foregoing reasons, the court hereby **GRANTS** defendant's motion for summary judgment [41] and **DENIES** plaintiff's motion for summary judgment [43]. More specifically, the court holds that defendant is not estopped from asserting defenses of noncoverage under both the CGL Policy and the Umbrella Policy. In addition, at the hearing held on March 7, 2013, counsel for defendant submitted that if the court denied plaintiff's estoppel claims, it would dismiss its counterclaims, which sought the court's declaration that defendant is not required to indemnify under the CGL Policy and the Umbrella Policy. In light of this submission and the court's holding, the court hereby dismisses defendant's counterclaims[21] and **ENTERS** judgment in favor of defendant on all of plaintiff's claims.

**IT IS SO ORDERED.**

---

**20.** It is not disputed that defendant defended Langboard II solely under the CGL Policy, not under the Umbrella Policy. With respect to the Umbrella Policy, Farrell testified:

 Q: Prior to trial, you had never reported Langboard II to the excess group here?
 A: No.

(Dep. of Farrell 179.)

**21.** In view of this holding, the court need not address defendant's argument that there is no coverage under the Umbrella Policy because plaintiff never provided sufficient notice of a claim under that policy.